57 A.3d 1154

Marjorie GOLDMAN, Appellant,

v.

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION
AUTHORITY, Appellee.

Edmund Wiza, Appellant,

v.

Southeastern Pennsylvania Transportation Authority, Appellee.

Michael J. Maguire, Appellant,

v.

Southeastern Pennsylvania Transportation Authority, Appellee.

Errol Davis, Appellant,

v.

Southeastern Pennsylvania Transportation Authority, Appellee.

Supreme Court of Pennsylvania.

Argued Sept. 14, 2011.

Decided Dec. 19, 2012.

502

504

Robert St. Leger Goggin III, Forceno, Goggin & Keller, P.C., King of Prussia, for Edmund Wiza.

Lawrence Alan Katz, Coffey Kaye Myers & Olley, Bala Cynwyd, John B. McDermott, Feldman & Pinto, P.C., James J. McEldrew III, Philadelphia, for Marjorie Goldman.

Lawrence Alan Katz, Coffey Kaye Myers & Olley, Bala Cynwyd, Samuel Jay Rosenthal, Philadelphia, for Errol Davis.

William Louis Myers Jr., Myers Lafferty Law Offices, P.C., Philadelphia, for Michael J. Maguire.

Jeffrey A. Bartos, Paul E. Knupp III, Guerrieri Clayman Bartos & Parcelli, PC, Margo Pave, Michael S. Wolly, Zwerdling Paul Kahn & Wolly, PC, for Appellants Amicus Curiae, Brotherhood of Locomotive Engineers & Trainmen, the International Association of Machinists and Aerospace Workers, the International Brotherhood of Electrical Workers, the Sheet Metal Workers International Association, the Transportation–Communications International Union, and the United Transportation Union.

Carl D. Buchholz III, Rawle & Henderson, LLP, Philadelphia, for Southeastern Pennsylvania Transportation Authority.

Dolores Rocco, Law Office of Dolores Rocco Kulp, Nicholas J. Staffieri, SEPTA (Southeastern Pennsylvania Transportation Authority), Philadelphia, for Southeastern Pennsylvania Transportation Authority.

Joseph R. Biden, III, Marc P. Niedzielski, for Appellee Amicus Curiae, State of Delaware.

John G. Knorr III, Harrisburg, for Appellee Amicus Curiae, Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice TODD.

In this appeal, our Court granted review to determine whether Appellee, the Southeastern Pennsylvania Transportation Authority ("SEPTA"), may be considered an "arm" of the Commonwealth of Pennsylvania which, under the Eleventh Amendment to the United States Constitution, would confer upon SEPTA sovereign immunity from lawsuits brought by injured employees of its Regional Rail Division under the Federal Employees Liability Act ("FELA") 45 U.S.C. §§ 51–60.[1] After careful review, we conclude SEPTA cannot be deemed an "arm" of the Commonwealth and, thus, is not entitled to sovereign immunity from such suits under the Eleventh Amendment. We, therefore, reverse the order of the Commonwealth Court and remand this case to the trial court for further proceedings.

### I. Factual Background and Procedural History

Appellants in this matter, Marjorie Goldman, Edmund Wiza, Michael Maguire, and Errol Davis, individually commenced lawsuits against SEPTA in the Court of Common Pleas of Philadelphia asserting that they sustained injuries during the course and scope of their employment with the Regional Rail Division of SEPTA.[2] SEPTA, which was created in 1963 by

1. FELA establishes a compensation structure for railroad workplace injuries which preempts state tort remedies and workers' compensation statutes. *Norfolk Southern Railway v. Sorrell*, 549 U.S. 158, 165, 127 S.Ct. 799, 166 L.Ed.2d 638 (2007); *see also Trucco v. Erie R.R.*, 353 Pa. 320, 45 A.2d 20 (1946) (FELA furnishes an injured railway worker a sole and exclusive remedy; hence, the Pennsylvania Workmen's Compensation Act is "inapplicable.") However, FELA is not in the nature of a typical workers' compensation system, which provides an injured worker with monetary compensation for his or her injuries without regard to fault, but, instead, provides the injured railroad worker a statutory cause of action based on principles of negligence. 45 U.S.C. § 51.

2. Goldman, Maguire, and Davis were employed as conductors on SEPTA trains, and alleged in their complaints that their injuries occurred during the course of their respective duties relating to the operation of those trains. Wiza held the position of welder and electrician, and he claims to have sustained injuries as the result of a slip and

the Metropolitan Transportation Authorities Act ("MTAA"),[3] is a regional transportation authority tasked with establishing, developing, and maintaining an integrated mass transit system for the greater Philadelphia metropolitan area. SEPTA principally serves five counties geographically located in southeastern Pennsylvania: Bucks, Chester, Delaware, Montgomery, and Philadelphia, and it provides transportation by bus, trolley, and subway train within those counties. Additionally, it furnishes interstate transportation service between Pennsylvania and the states of Delaware and New Jersey through its Regional Rail Division which operates commuter rail lines traversing all three states.

Employees of SEPTA's Regional Rail Division have been covered by FELA since 1983 when the Regional Rail Division assumed responsibility for providing passenger rail services formerly provided by Conrail.[4] Since FELA provides for concurrent jurisdiction between state and federal courts for all actions brought thereunder,[5] all four lawsuits in the instant matter sought recovery from SEPTA pursuant to FELA, asserting, *inter alia,* the negligence of SEPTA in the causation of their respective injuries.

In response to each of the suits brought by Appellants Goldman, Wiza, and Maguire in the Court of Common Pleas of Philadelphia, SEPTA filed a motion for judgment on the pleadings on the basis that it was a state agency immune from suit under the doctrine of sovereign immunity. The cases were consolidated for argument before the Honorable Nitza I. Quinones Alejandro, who denied the motions.

Subsequently, SEPTA filed a motion for summary judgment in these three cases, again averring that it was a state agency, and, also, asserting that it was an instrumentality of the Commonwealth entitled to sovereign immunity under Article

fall accident which occurred on property owned by SEPTA while he was performing an assigned task.

3. Act of August 14, 1963, P.L. 984, No. 450, 66 Pa.C.S.A. §§ 2001–2043 (repealed), current version at 74 Pa.C.S.A. §§ 1701 *et.seq.*

4. *Felton v. SEPTA,* 952 F.2d 59, 65 (3d Cir.1991).

5. 45 U.S.C. § 56.

1, § 11 of the Pennsylvania Constitution and 42 Pa.C.S.A. § 2310. SEPTA additionally contended that the Eleventh Amendment to the United States Constitution conferred immunity upon it under certain relevant interpretive decisions of the United States Supreme Court, discussed at greater length *infra*, as it viewed itself "[a]s the State's arm/alter ego for mass transit." SEPTA Motion for Summary Judgment, 7/31/08, at ¶ 62.

In response, Appellants Goldman, Wiza, and Maguire filed a joint motion for partial summary judgment seeking to dismiss or strike the affirmative immunity defenses SEPTA raised. Appellants averred that SEPTA was not a part of the Commonwealth government, and, thus, was not entitled to assert the sovereign immunity of a state against a suit by a private individual brought under federal law.

At the request of the parties, Judge Alejandro conducted extensive hearings over a three-day period in order to permit the parties to develop an evidentiary record pertaining to issues raised in the motions, such as the manner in which SEPTA was legally structured, conducted its operations, and the means by which those operations were funded. Judge Alejandro subsequently denied SEPTA's motion for summary judgment, and granted Appellants' joint motion for partial summary judgment. SEPTA sought to have this order certified for purposes of immediate appeal, and Judge Alejandro granted the motion.

With respect to Appellant Davis' FELA action, also filed in the Court of Common Pleas of Philadelphia, SEPTA filed a motion for summary judgment asserting that SEPTA, as an agency of the Commonwealth, had sovereign immunity under the Pennsylvania Sovereign Immunity Act, 42 Pa.C.S.A. §§ 8501–8527, and, thus, may be sued only if the suit falls within one of the enumerated exceptions set forth in the Act, *see id.* § 8522. SEPTA contended that the Commonwealth had not waived SEPTA's sovereign immunity, and that since sovereign immunity was recognized as a state's constitutional right, Congress did not have the power, absent such an express waiver, to subject SEPTA to suit under FELA. The

matter was assigned to Senior Judge Sheldon Jelin, who denied the motion and scheduled the case for trial.

Prior to trial, SEPTA renewed its motion for summary judgment based on its claim of sovereign immunity. Judge Jelin did not rule on this new motion, and Davis's case proceeded to jury trial, after which the jury returned a verdict in Davis's favor in the amount of $740,000. SEPTA filed post-trial motions which Judge Jelin granted in part, and he awarded SEPTA a new trial. Judge Jelin dismissed SEPTA's renewed motion for summary judgment as moot. Davis appealed to the Commonwealth Court, which reversed Judge Jelin's order granting a new trial and directed Judge Jelin to address SEPTA's motion for summary judgment on the issue of sovereign immunity. Upon reconsideration, Judge Jelin granted the motion and entered summary judgment in favor of SEPTA. Davis appealed that determination.

Inasmuch as SEPTA's appeal in the Goldman, Wiza, and Maguire matters and Davis' appeal presented the identical question of whether the Commonwealth's sovereign immunity extended to shield SEPTA from FELA claims brought in Pennsylvania courts, the Commonwealth Court consolidated both appeals for consideration. In connection with that consolidated appeal, both Judge Alejandro and Judge Jelin authored opinions pursuant to Pa.R.A.P. 1925(a) explaining their respective rationales for arriving at opposing resolutions of this question.

Judge Alejandro noted that, because Congress enacted FELA pursuant to the Commerce Clause of the United States Constitution, under *Seminole Tribe v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (holding that a state's immunity conferred by the Eleventh Amendment may not be overridden by Congress pursuant to its Commerce Clause powers), FELA itself could not and did not abrogate the Commonwealth's Eleventh Amendment immunity; however, she found that, in a later case, *Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (holding states have sovereign immunity in their own courts from suits brought by private individuals under federal law), the high Court specified

that only states themselves and entities which could be considered arms of the state were entitled to claim such immunity. Thus, she focused on the question of whether SEPTA could be considered an arm of the Commonwealth of Pennsylvania.

In this regard, Judge Alejandro discussed various decisions from our Court and the Commonwealth Court, which reached differing conclusions on the question of SEPTA's status as an agency of the Commonwealth in various cases brought under Pennsylvania law. Judge Alejandro rejected the idea that decisions from our Court recognizing SEPTA's immunity from suit under state law were controlling as to whether SEPTA was subject to the application of FELA, which is a federal statute, since she viewed the applicability of the defense of sovereign immunity to this federal cause of action as governed by federal law.

Judge Alejandro noted that the Third Circuit devised its own multifactor test, which it uses to determine if an entity constitutes an arm of the state such that it is entitled to Eleventh Amendment immunity. This test examines three principal factors to which it accords equal weight: (1) whether the payment of a judgment against the entity would come from the state, (2) the entity's status under state law, and (3) the entity's degree of autonomy. Opinion of Judge Alejandro, 12/24/08, at 17 (quoting *Fitchik v. New Jersey Rail Operations*, 873 F.2d 655, 659 (3d Cir.1989)(determining that "New Jersey Transit," a public corporation which operated commuter passenger rail service, was not the "alter ego" of the state of New Jersey entitling it to Eleventh Amendment immunity) ("the *Fitchik* test")).

Judge Alejandro found that the Third Circuit twice ruled, after applying the *Fitchik* test, that SEPTA was not a Commonwealth agency, but, rather, was a political subdivision not entitled to raise the defense of sovereign immunity. *See* Alejandro Opinion at 17–18 (citing and discussing *Bolden v. SEPTA*, 953 F.2d 807 (3d Cir.1991) (a civil rights action brought in federal court under 42 U.S.C.A. § 1983) and *Cooper v. SEPTA*, 548 F.3d 296 (3d. Cir.2008) (a suit brought in federal court under the Fair Labor Standards Act)). Judge

Alejandro noted that, in both cases, the Third Circuit concluded SEPTA could not meet the first prong of the *Fitchik* test, since judgments against SEPTA would not be paid from the Pennsylvania treasury; the second prong weighed only slightly in favor of treating it as an arm of the Commonwealth because SEPTA possessed characteristics of both state and municipal governments; and, finally, SEPTA could not meet the third prong of the test since it enjoyed a large degree of autonomy from the Commonwealth government. Judge Alejandro believed that the rulings in *Bolden* and *Cooper* were dispositive in establishing that SEPTA does not have sovereign immunity from actions brought under federal law, and, hence, she concluded that she was "instantly preempted from ruling otherwise." [6] Alejandro Opinion at 18. Even so, Judge Alejandro proceeded to conduct her own analysis using the *Fitchik* test, and she independently concluded that SEPTA was not an arm of the Commonwealth.

In his Rule 1925(a) opinion reaching the opposite conclusion, Judge Jelin considered SEPTA's assertion of sovereign immunity to be based on the Pennsylvania Sovereign Immunity Act and, therefore, not an assertion of immunity under the Eleventh Amendment. Even so, with respect to the Eleventh Amendment question, Judge Jelin, like Judge Alejandro, agreed that the United States Supreme Court had rejected the principle that a federal law by its own terms could override the sovereign immunity of a state, and, in a later case, *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999), also repudiated the doctrine of "constructive waiver," under which a state's mere engagement in an activity after adoption of a federal statute regulating such activity was regarded as the state's implicit waiver of Eleventh Amendment immunity. Thus, Judge Jelin concluded there was no evidence of record to suggest that SEPTA expressly waived its sovereign immunity with respect to suits under FELA, and he regarded the Commonwealth Court's prior opinion remand-

6. In this regard, we address the binding effect of decisions of lower federal courts on the courts of this Commonwealth. *See infra* note 12.

ing the case to have already determined that SEPTA was a "Commonwealth Party" entitled to sovereign immunity under 42 Pa.C.S. § 8521. Additionally Judge Jelin found that Davis had presented no evidence to show that his cause of action fell within any of the exceptions allowing suit against a Commonwealth party provided by 42 Pa.C.S. § 8522(b). For both reasons, Judge Jelin found dismissal of Davis's suit to have been proper.

The Commonwealth Court, in a published *en banc* opinion authored by Judge Johnny Butler, affirmed Judge Jelin's entry of summary judgment for SEPTA in the Davis case, and reversed Judge Alejandro's denial of SEPTA's motion for summary judgment in the Goldman, Wiza, and Maguire cases. *Davis v. SEPTA,* 980 A.2d 709 (Pa.Cmwlth.2009). The Commonwealth Court observed that, under the Supreme Court's decision in *Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994), as a general matter, agencies of a state do not enjoy immunity under the Eleventh Amendment, "unless there is good reason to believe that the State structured the new agency to enable it to enjoy the special constitutional protection of the State itself." *Davis,* 980 A.2d at 712 (quoting *Hess,* 513 U.S. at 43–44, 115 S.Ct. 394, in turn quoting *Lake Country Estates Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 401, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979)) (internal quotation marks omitted). To answer this question, the court first looked at SEPTA's organic statute, the aforementioned MTAA, and concluded it "explicitly establishes SEPTA as a Commonwealth party which enjoys the Commonwealth's sovereign immunity." *Davis,* 980 A.2d at 712. The court cited 74 Pa.C.S.A. § 1711(a), which states that SEPTA "shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof ... for the purpose of ... operating ... and otherwise functioning with respect to a transportation system", and Section 1711(c)(3), which provides it is "the intent of the General Assembly that an authority created or existing under this chapter ... shall continue to enjoy sovereign and official

immunity ... and shall remain immune from suit [subject to exceptions not relevant herein]."

The court also cited the following factors in support of a finding that SEPTA was structured to enjoy the Commonwealth's sovereign immunity: (1) the critical role that SEPTA plays in providing transportation to residents in the proximate geographic area of the Commonwealth's largest city; (2) SEPTA's right to exercise the power of eminent domain, which the court viewed as indicative of a government function; and (3) the fact that, in fiscal years 2009 and 2010, the Commonwealth provided over 50% of SEPTA's operating and capital budgets. The court additionally noted the Commonwealth Courts' own past decisions which recognized SEPTA as a Commonwealth party entitled to sovereign immunity under Section 8521 of the Pennsylvania Sovereign Immunity Act, 42 Pa.C.S.A. § 8521,[7] and it found that FELA claims did not fall within any of the exceptions to the sovereign immunity of Commonwealth parties, enumerated in 42 Pa.C.S. § 8522. For these reasons, the court concluded that SEPTA was immune from FELA claims in Pennsylvania courts. While the court acknowledged the Third Circuit's *Cooper* decision, it expressed the view that the Third Circuit failed to recognize that SEPTA's enabling statute regarded SEPTA as a Commonwealth agency for purposes of sovereign immunity. *Davis*, 980 A.2d at 715.

Then Judge, now President Judge Dante Pellegrini dissented. Judge Pellegrini pointed out that, in *Hess* and in *Regents of the Univ. of California v. Doe*, 519 U.S. 425, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997), the high Court established that an important consideration in determining immunity is whether a state would be legally liable for any judgment entered against a lesser entity which it had created. Also, Judge Pellegrini noted that, in *Federal Maritime Com'n v. South Carolina State Ports Auth.*, 535 U.S. 743, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002), the high Court suggested that the Eleventh Amendment's central purpose was to " 'accord the states the

---

7. *SEPTA v. Holmes*, 835 A.2d 851 (Pa.Cmwlth.2003); *Warnecki v. SEPTA*, 689 A.2d 1023 (Pa.Cmwlth.1997); and *Chambers v. SEPTA*, 128 Pa.Cmwlth. 368, 563 A.2d 603 (1989).

respect owed to them as joint sovereigns.'" *Davis,* 980 A.2d at 717 (quoting *Federal Maritime,* 535 U.S. at 743, 122 S.Ct. 1864).[8] Judge Pellegrini reasoned that if SEPTA were an "arm of the state," it could share in our Commonwealth's immunity as a sovereign entity under the Eleventh Amendment, but, if it were not, it would continue to be subject to FELA actions.

Because of concurrent jurisdiction over FELA actions between state courts and federal courts, Judge Pellegrini considered it "particularly appropriate to examine how the Third Circuit confers Eleventh Amendment immunity on SEPTA," reasoning that "[i]f we are at odds with the Third Circuit, the net result will be that plaintiffs will bring their actions in federal court." *Davis,* 980 A.2d at 717. He noted that the Third Circuit in both *Bolden* and *Cooper* applied its three-factor *Fitchik* "arm of the state" test and determined that SEPTA is not an arm of the Commonwealth. He pointed out that the Third Circuit regarded the factor on which the majority most relied—the designation by the legislature of SEPTA as an agency covered by the Pennsylvania Sovereign Immunity Act—to be "significant but not dispositive," on the grounds that a state legislature cannot confer Eleventh Amendment immunity on any entity simply by declaring the entity immune from suit. *Davis,* 980 A.2d at 719. Judge Pellegrini also observed that, in *Cooper,* the Third Circuit found that, despite the receipt by SEPTA of state funding, SEPTA retained autonomy because the Commonwealth had no means of dictating the outcome of decisions made by the SEPTA board of directors (the "SEPTA Board"), and, further, that other entities which depend on state governments for conditional funding, e.g., political subdivisions, are not deemed to be arms of the state simply because of receipt of that funding. Judge Pellegrini expressed his agreement with the Third Circuit's application of the *Fitchik* test, and, thus, endorsed its conclusion that SEPTA was not entitled to Eleventh Amendment immunity.

8. These points, while alluded to, were not developed in the dissent.

We granted Appellants' petition for allowance of appeal to consider the following questions, as stated by Appellants:

1. Whether the Commonwealth Court in a case of first impression—for the first time in SEPTA's 46 years existence—incorrectly held, because the court failed to follow the United States Supreme Court's mandated "arm of the state" jurisprudence, that SEPTA is not obligated to comply with federal laws, stripping SEPTA employees of the rights and protections railroad employees have enjoyed for a century under the Federal Employers' Liability Act.

2. Whether the Commonwealth Court's decision should be reversed because the decision (a) ignores the United States Supreme Court's mandate in *Lake Count[r]y* and *Hess* that sovereign immunity must be determined based upon a detailed analysis of several specific factors against which to determine an entity's nature and structure and (b) was only based on the state legislature's label of SEPTA as a "Commonwealth Agency and Instrumentality," and the Commonwealth's partial voluntary funding of SEPTA.

*Goldman v. SEPTA*, 608 Pa. 138, 10 A.3d 898 (2010) (order).[9]

## II. Argument

We begin with a review of the arguments advanced by the parties. Appellants observe that our Court has always recog-

9. We also granted review on the question of whether the Commonwealth Court properly interpreted Section 8522(b) of the Pennsylvania Sovereign Immunity Act as barring FELA claims. However, as SEPTA notes in its brief, Appellants present no argument in their primary brief with respect to this issue. Thus, we deem it waived and will not address it. *In re Private Road in Speers Boro, II, Washington County*, 608 Pa. 302, 307 n. 5, 11 A.3d 902, 905 n. 5 (2011). Such waiver, however, does not affect our consideration of Appellants' first two claims, inasmuch as Congress, through the enactment of FELA, created a federal statutory right of action for injured railroad workers to obtain redress for their injuries, and the question of whether a state-created entity sued thereunder is entitled to raise the defense of state sovereign immunity is a federal question, the resolution of which is solely governed by federal law. *See Owen v. City of Independence, Mo.* 445 U.S. 622, 648 n. 30, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) ("Municipal defenses—including an assertion of sovereign immunity-to a federal right of action are, of course, controlled by federal law."); *Howlett*, 496 U.S. at 375, 110 S.Ct. 2430 ("The elements of, and the defenses to, a

nized that authorities and agencies are distinct legal entities and, thus, cannot automatically be considered extensions of the Commonwealth. Appellants' Brief at 14 (citing *In re Acquisition of Water System in White Oak Borough*, 372 Pa. 424, 427, 93 A.2d 437, 438 (1953) ("Authorities ... have no original or inherent or fundamental powers of sovereignty or of legislation; they have only the power and authority granted them by enabling statutory legislation."); *Tork–Hiis v. Commonwealth*, 558 Pa. 170, 177, 735 A.2d 1256, 1259 (1999) ("The commonwealth and its agencies are distinct legal entities.")). Appellants contend that the United States Supreme Court established that the question of whether a particular entity may be considered an arm of the state entitled to immunity from suits in their own courts is a question of federal law, and rejected the notion that this determination can rely solely on a state's designation.

Appellants note that *Bolden* established that the Commonwealth's designation of SEPTA as an instrumentality and agency of the Commonwealth was not, by itself, dispositive of the question of whether SEPTA was an arm of the Commonwealth since it would allow a state legislature to freely exempt all manner of lesser government entities from federal suit. Further, Appellants assert that following this analysis would be contrary to the principle that the will of the people as expressed through Congressional legislative enactments may not be thwarted by state legislation alone, since that would serve to remove a state's populace from the protections provided to them by Congress.

Appellants argue that, in undertaking the *Lake Country* inquiry to determine whether the state structured an agency to enjoy its Eleventh Amendment immunity, relevant factors

federal cause of action are defined by federal law.") Moreover, states cannot confer immunity on entities against a suit brought under federal law by mere statutory enactment alone. *Howlett; see also infra* note 19. Therefore, because the issue of whether SEPTA is an arm of the Commonwealth entitled under the Eleventh Amendment to claim the protection of the Commonwealth's sovereign immunity is a question of federal law, interpretation of the Pennsylvania Sovereign Immunity Act does not control our resolution of this question.

in addition to the characterization of the entity in its enabling legislation which created the entity should be examined, such as: how the entity operates; who appoints its governing Board; whether the state can veto the Board action; where the Board members reside; whether the Board's actions are local or statewide in scope; whether state law decisions affect the Board's operation; and whether the state is legally obligated to either fund the entity or pay the debts of the entity. Appellants proffer that all of these factors are incorporated into the Third Circuit's three-part *Fitchik* test which it applied in *Bolden* and *Cooper* to hold that SEPTA is not an arm of the state. Appellants also assail the decision of the Commonwealth Court as fundamentally flawed since it did not examine all relevant factors under *Lake Country* and *Hess*, but, rather, focused exclusively on SEPTA's designation in its enabling statute as a Commonwealth instrumentality.

Appellants assert that the following additional factors support the conclusion that SEPTA is not an arm of the Commonwealth of Pennsylvania:

- Neither former Governor Rendell, nor Governor Corbett list SEPTA in their budgets as a Commonwealth department or agency;
- SEPTA is not listed in the Commonwealth's Annual Financial Report, which identifies all "component units" of the Pennsylvania state government for which the Commonwealth is financially responsible;
- SEPTA is autonomous from the Commonwealth's government since:
 (a) it has a perpetual life;
 (b) it can sue and be sued in its own capacity without approval from the state legislature;
 (c) the SEPTA Board makes decisions and sets policy apart from the direction of any Commonwealth official;
 (d) SEPTA approves its own budget and sets expenditures;
 (e) the Governor has no veto over actions of the SEPTA Board;

(f) local governments appoint 2/3 of the SEPTA Board's members;

(g) SEPTA's employees are not considered employees of the Commonwealth as they are not eligible to participate in Commonwealth benefit plans, nor can SEPTA executives be employed by the Commonwealth;

(h) SEPTA can commence eminent domain actions on its own without approval of the Commonwealth;

(i) SEPTA can enter into contracts and purchase real estate without approval of the Commonwealth and can, in its own capacity, borrow money; and

(j) SEPTA may issue debt on its own in the form of tax free municipal bonds for which it may not obligate or pledge the assets of the Commonwealth and for which it is wholly financially responsible;

- The Commonwealth requires the five counties in the Philadelphia region to subsidize SEPTA, which the General Assembly does not require for any Commonwealth department or agency, and the five counties can audit SEPTA, a process that no other Commonwealth agency is subject to; and

- The amount of FELA judgments SEPTA would be subject to is small relative to its total ability to pay; thus the likelihood of Commonwealth monies being used to pay a FELA judgment is small.[10]

*See* Appellants' Brief at 39–42.

Finally, Appellants contend that the amount of state subsidies SEPTA receives is less than that computed by the Commonwealth Court. They argue that from 2004 through 2007, 64 percent of SEPTA's budget came from sources other

10. According to Appellants, the evidence of record adduced at the hearing before Judge Alejandro showed that the amount of FELA judgments against SEPTA in 2005 was $13.8 million, in 2006, $6.3 million, and in 2007, $9,465 million. By contrast, Appellants point to additional evidence which suggests SEPTA has a cash reserve fund of $130 million and cash on hand of $146 million, with its total net worth estimated at $3 billion. Appellants' Brief at 35 (citing N.T., 1/28/08 (Testimony of SEPTA budget director Richard Burnfield), at 82 (R.R. at 1269a)).

than the Commonwealth. Appellants also point out that the Act 44 funding levels for 2008, 2009, and 2010, cited by the Commonwealth Court, were guaranteed for only those three years, and funding beyond that time period was contingent upon the federal government approving Pennsylvania's request to toll I–80, which was denied. Thus, since anticipated funding from that source will not materialize due to the denial of Pennsylvania's tolling application, the total state subsidy to SEPTA will be diminished correspondingly. Consequently, Appellants maintain that the Commonwealth Court's assumption that the amount of state subsidy would indefinitely remain at those levels, thereby ensuring a greater degree of control by the Commonwealth, was, in hindsight, flawed. In sum, Appellants argue that the Commonwealth Court erred by improperly ignoring all of these factors which, in their view, lead to the conclusion that SEPTA cannot be classified as an arm of the Commonwealth.

SEPTA responds by averring that, beginning with *Mt. Healthy v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (holding that a local school board was not entitled to sovereign immunity), and continuing through *Lake Country, Hess, Regents,* and *Federal Maritime,* the United States Supreme Court has always looked to the structure and nature of an entity under state law as part of its sovereign immunity analysis. Thus, SEPTA reasons the Commonwealth Court properly relied on the provisions of the MTAA as proof that SEPTA was structured to enjoy the sovereign immunity of the Commonwealth.

SEPTA points out that the high Court also emphasized that federalism requires that decisions of a state's highest court on the question of an entity's status under state law should be given deference as representing the sovereign will of that state. In this regard, SEPTA points out that our Court, in three principal cases, found it was the intent of the General Assembly, as reflected in the MTAA, to have SEPTA treated as a Commonwealth agency and, thus, to share the Commonwealth's sovereign immunity. Appellant's Brief at 14–15 (discussing *Feingold v. SEPTA,* 512 Pa. 567, 517 A.2d 1270 (1986),

*Tulewicz v. SEPTA*, 529 Pa. 588, 606 A.2d 427 (1992), and *SEPTA v. Board of Revision of Taxes*, 574 Pa. 707, 833 A.2d 710 (2003)). SEPTA asserts these cases establish and represent the will of our Commonwealth as it pertains to a matter integral to its sovereignty—namely, the basic manner in which its government is to be structured.

SEPTA further asserts that according it sovereign immunity is consistent with the recognition in *Hess* that, both legally and practically, a state treasury should not be depleted by judgments against it; according to SEPTA, this was one of the twin purposes served by the Eleventh Amendment acknowledged by the high Court in that decision. SEPTA argues that this concern is implicated presently since it is so heavily dependent on state subsidies, which it estimates to be in excess of $750,000,000. SEPTA contends that "exposing SEPTA to a multitude of FELA claims has an impact on the Commonwealth's treasury and injures the Commonwealth itself." SEPTA Brief at 21. In SEPTA's view, exposing it to FELA liability "undermines the ability of the Commonwealth to govern its own affairs and thereby strikes at the core of sovereignty." *Id.* at 22.

SEPTA additionally avers that it is not autonomous, noting: the MTAA specifies procedures it must follow to terminate transportation routes, and requires it to hold public hearings before changing routes or altering fares; the SEPTA Board was created by the MTAA which specifies the manner in which the Board's membership is to be filled, how employees are to be hired, their compensation, and the procedure which must be followed to discipline them; and the MTAA spells out the strict procurement procedures which SEPTA must follow to purchase equipment such as railway vehicles, and contains other controls on its discretion such as restricting advertising to only the interior of vehicles.

Lastly, SEPTA highlights its newfound operational relationship with the Commonwealth after the passage of Act 44 since it must now, as a condition of receiving that funding, submit an operating budget indicating how anticipated income in the budget will be allocated between operating revenues and state

subsidies, and that it and PennDot must enter into a financial assistance agreement which specifies how state subsidy money is to be spent. Further, Act 44 provides that spending of money pursuant to the agreement is subject to performance audits by PennDot which issues recommendations for specific administrative actions by SEPTA. SEPTA discounts the lack of state control of the SEPTA Board as a determinative factor—reasoning that the state holds effective control of its financial survival through "the power of the purse." SEPTA Brief at 27.

SEPTA urges us not to follow the Third Circuit's approach in *Bolden* or *Cooper*—asserting that we are only bound by decisions of the United States Supreme Court on issues of federal law. SEPTA argues the Third Circuit's approach in *Bolden* and *Cooper* is *sui generis* as compared to that of other circuit courts of appeals in that it has accorded equal weight to all three factors of its test, in contrast to what SEPTA perceives as the directives of the United States Supreme Court to accord primacy to the first two prongs of its test— i.e., the degree of impact on the state treasury and the entity's status under state law.

Amicus, the Commonwealth of Pennsylvania, has filed a brief expressing its position that, while this Court is not bound by the decisions of the Third Circuit Court of Appeals on the question of SEPTA's immunity under the Eleventh Amendment, we should, nevertheless, apply its three-factor *Fitchik* test, which it views as both reflective of the concerns undergirding the Supreme Court's jurisprudence on this issue, and, also, similar in nature to the test utilized by other federal courts of appeal. The Commonwealth asserts that application of that test would lead to the conclusion that SEPTA is an arm of the Commonwealth.[11]

11. The state of Delaware has also filed an amicus brief in which it points out that a provision of an agreement between SEPTA and the Delaware Transit Corporation provides, *inter alia,* that the agreement does not operate to waive any sovereign immunity which SEPTA enjoys under the law of the Commonwealth of Pennsylvania—a factor which it contends establishes Delaware's recognition of SEPTA's sovereign status. Further, Delaware notes that, under this agreement, it is required

## III. Analysis

### A.

■■■■ As indicated by the unified manner in which they have framed their argument in their brief, Appellants' two issues may be distilled to one central question—whether SEPTA may be considered an arm of the Commonwealth, such that it is entitled to claim sovereign immunity from FELA suits brought against it in Pennsylvania courts under the Eleventh Amendment to the United States Constitution.[12] Since this question is a purely legal one, our standard of review is *de novo* and, as such, we are not required to defer to the legal conclusions made by the lower courts. *Fine v. Checcio*, 582 Pa. 253, 265 n. 3, 870 A.2d 850, 857 n. 3 (2005). In conducting our review, our scope of review is plenary.

to indemnify SEPTA for the cost of all FELA claims which originate out of SEPTA's operation of its rail service in the state of Delaware. Thus, Delaware reasons that allowing FELA claims against SEPTA would result in economic losses to the state of Delaware, thereby resulting in a diminution of Delaware's ability to provide transportation services to its residents and increased costs to its residents.

An additional amicus brief was filed by a number of unions who represent railroad workers. *Amici* urge us to retain SEPTA's current status as an entity which is not immune from suit under FELA in Pennsylvania courts, since they maintain this would be consistent with the historical purpose of FELA, which is to afford injured railway workers a tort remedy which they could avail themselves of in state court.

12. We note that Appellants and amicus, the Commonwealth of Pennsylvania, have suggested applying the Third Circuit's *Fitchik* test to the resolution of this question of federal law, and, also, that the trial judges below have expressed conflicting views in their respective opinions on the binding effect of the decisions of the Third Circuit Court of Appeals in *Bolden* and *Cooper, supra*. While we certainly find these decisions instructive, their holdings—that SEPTA should not be accorded sovereign status under the Eleventh Amendment as an arm of the Commonwealth of Pennsylvania—are not binding on us or any other court of this Commonwealth. *See, e.g., In re Stevenson,* —— Pa. ——, 40 A.3d 1212, 1221 (2012) (acknowledging that while we are bound by decisions of the United States Supreme Court on federal law, "pronouncements of the lower federal courts have only persuasive, not binding, effect on the courts of this Commonwealth."). Accordingly, we will make our own independent determination of this question, guided by the teachings of the United States Supreme Court.

*Weaver v. Lancaster Newspapers,* 592 Pa. 458, 465, 926 A.2d 899, 903 (2007).

The text of the Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. This amendment was promulgated by Congress in 1794 and became part of the Constitution when ratified by 12 states in 1795.[13] The amendment was an apparent response to the United States Supreme Court decision in *Chisholm v. Georgia,* 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793). In *Chisholm,* eight justices of the high Court agreed, pursuant to differing rationales, that under the Judiciary Act of 1789, which was, in turn, founded on the language of Article III of the United States Constitution, the state of Georgia could be sued in the original jurisdiction of the high Court by a private individual for the repayment of monies he loaned to Georgia for its use in fighting the Revolutionary War. The decision proved controversial, and many historians believe that a substantial part of the motivation for the Eleventh Amendment's subsequent enactment was the states' fear that the *Chisholm* decision would encourage a multiplicity of such suits by creditors, including those of British subjects and Tory loyalists whose property had been seized during the Revolution.[14] Facially, the Eleventh Amendment would seem to have no applicability in barring suits against an entity such as SEPTA which is not a state, or in precluding suits by a state's residents in its own courts against such a state-created entity.

Indeed, in the aftermath of the states' ratification of the Eleventh Amendment, the high Court, speaking through Chief Justice Marshall, endorsed a strict textual construction of this amendment. *See e.g. Cohens v. Virginia,* 19 U.S. 264, 407, 6

13. Pennsylvania and New Jersey did not ratify the amendment.

14. Erwin Chemerinsky, *Constitutional Law, Principles and Policies,* 190 (4th ed.); Rotunda and Nowak, *Treatise on Constitutional Law–Substance and Procedure,* § 2–12(a).

Wheat. 264, 5 L.Ed. 257 (1821) (examining the language of the amendment and embracing the conclusion that "it was intended for those cases, and for those only, in which some demand against a State is made by an individual in the Courts of the Union."); *Osborn v. Bank of United States*, 22 U.S. 738, 847, 857, 9 Wheat. 738, 6 L.Ed. 204 (1824) ("The eleventh amendment of the constitution has exempted a State from the suits of citizens of other States, or aliens. . . . [I]t, is, of necessity, limited to those suits in which a State is a party on the record.") However, over time, the Court retreated from this literal interpretation of the Eleventh Amendment and began to embrace a broader view of the amendment which transcends its text.

In order to further what the high Court perceived to be the core purpose of the amendment—protection of a state's inherent sovereignty—it has repeatedly extended immunity to states from certain other types of private suits brought under federal law beyond those explicitly referenced in its text. *See Hans v. Louisiana*, 134 U.S. 1, 18, 10 S.Ct. 504, 33 L.Ed. 842 (1890) (repudiating *Chisholm* and disavowing Chief Justice Marshall's prior pronouncements in *Cohens* and *Osborn* and holding that federal courts had no power to entertain a suit against a sovereign state by its own citizens without its consent); *In re State of New York*, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1921) (Eleventh Amendment bars admiralty suits against states without their consent even though text of amendment refers only to suits "in law or equity"); and *Principality of Monaco v. State of Mississippi*, 292 U.S. 313, 321–322, 54 S.Ct. 745, 78 L.Ed. 1282 (1934) (Eleventh Amendment impliedly restricts the judicial power of the United States based on a recognition of state sovereignty which does not permit a suit against a state without its consent; thus, the amendment bars a private suit in federal court by a foreign nation unless the state has agreed to be subjected to such proceedings).

The high Court also abandoned the view that the protections of the Eleventh Amendment are applicable only in those instances in which a state is a named party. In its place, the

Court embraced an interpretation of the Eleventh Amendment which extended sovereign immunity to entities which are agents or instrumentalities of the state such that a suit brought against them would be, for all practical purposes, a suit against the state itself. *See, e.g., Ex Parte Ayers,* 123 U.S. 443, 506, 8 S.Ct. 164, 31 L.Ed. 216 (1887) (interpreting the Eleventh Amendment "not literally . . . but to accomplish the substance of its purpose"; holding that federal court lacked jurisdiction to enjoin attorneys from bringing suit against taxpayers of Virginia for delinquent taxes owed under bond coupons, since the state was the real party in interest affected by the decree); *Smith v. Reeves,* 178 U.S. 436, 439, 20 S.Ct. 919, 44 L.Ed. 1140 (1900) (where judgment sought against state official in federal court would require official to pay funds out of the state treasury in satisfaction, it would have the same practical effect as a judgment against the state itself and, hence, the federal action seeking judgment was barred by the Eleventh Amendment); *Ford Motor Co. v. Dept. of Treasury of Indiana,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945) (action against Indiana treasury department and its board members in their individual capacity was barred by the Eleventh Amendment since it was deemed to be an action to recover money from the state itself, hence, rendering the state the "real, substantial party in interest . . . entitled to invoke its sovereign immunity from suit."), *overruled on other grounds, Lapides v. Bd. of Regents of Univ. System of Georgia,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002); *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (holding that injunctive relief directing state officials to pay retroactive monetary relief violated the Eleventh Amendment since its practical effect was to require payment of public funds from the state treasury).

More recently, the principle that a proper interpretation of the Eleventh Amendment must go beyond the text of the amendment to a consideration of its underlying purpose was amplified by the high Court in the case of *Seminole Tribe,* where the high Court reminded:

[W]e have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition which it confirms [which] has two parts: first, that each State is a sovereign entity in our federal system; and second, that it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.

*Seminole Tribe*, 517 U.S. at 54, 116 S.Ct. 1114 (internal citations and quotations marks omitted). The Court explained that state sovereign immunity operated to limit the federal courts' jurisdiction under Article III of the United States Constitution, and, thus, Congress cannot, pursuant to its enumerated powers in Article I, expand the jurisdiction of federal courts beyond the boundaries set by that amendment and allow "federal question" suits by private parties to be brought against non-consenting states in federal court. Instead, the Court stressed that Congress may abrogate a state's immunity from such suits only if it is acting pursuant to its authority under the Fourteenth Amendment to the United States Constitution. *Seminole Tribe*, 517 U.S. at 58–59, 116 S.Ct. 1114 (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (recognizing the Fourteenth Amendment conferred on Congress the power, notwithstanding the Eleventh Amendment, to abrogate a state's sovereign immunity from federal suit)).[15] The Court, in noting that Congress's power to abrogate is not dependent on the nature of the particular relief which it statutorily authorizes, underscored that the "Eleventh Amendment does not exist solely in order to prevent federal-court judgments that must be paid out of a state's treasury . . . [;] it also serves to avoid the indignity of subjecting a State to the coercive process of judicial tribunals

15. Judge Alejandro found, and the parties apparently conceded, FELA was promulgated pursuant to Congress's power under the Commerce Clause of the United States Constitution, and, thus, in her view, pursuant to *Seminole Tribe*, Congress could not have abrogated a state's sovereign immunity under this act even if it had so intended. We express no opinion on this conclusion as we did not accept review to address that question. Because both parties agreed below that FELA does not abrogate the sovereign immunity of the Commonwealth, we will assume, for the purposes of our review, the truth of this proposition.

at the instance of private parties." *Seminole Tribe,* 517 U.S. at 58, 116 S.Ct. 1114 (internal citations and quotation marks omitted).

This "twin purpose" theory of the Eleventh Amendment articulated in *Seminole Tribe* formed the foundation of the Court's subsequent decision in *Alden.* In *Alden,* the Court explained that states' sovereign immunity from suit was not "derived from, nor . . . limited by, the terms of the Eleventh Amendment. Rather, . . . the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) except as altered by the plan of the [Constitutional] Convention or certain constitutional amendments." *Alden,* 527 U.S. at 713, 119 S.Ct. 2240. The Court found the doctrine of the English common law, which held that the Crown could not be sued without its consent in its own courts, since no court could have jurisdiction over the king by virtue of his superiority in power, was "universal in the States when the Constitution was drafted and ratified." *Id.* at 706, 119 S.Ct. 2240. Thus, the Court reasoned that it was not the intent of the framers, through ratification of the Constitution, to strip states of their sovereign immunity. The Court viewed both the text of the Eleventh Amendment and the historical circumstances of its passage, as an attempt by Congress to "restore the original constitutional design." *Id.* at 722, 119 S.Ct. 2240.

The Court also highlighted two underlying principles of federalism that it perceived as counseling against recognizing a broad Congressional power to abrogate state sovereign immunity: the danger to states of insolvency through a drain on their treasuries by Congressional authorization of suits against the states, and the danger of state sovereignty being compromised if state courts were permitted to be commandeered into federal service "to coerce the other branches of the State . . . against its will and at the behest of individuals," *id.* at 749, 119 S.Ct. 2240, thereby interfering with the state's

ability to allocate resources in accordance with the needs and will of its citizens.

The Court, however, also reaffirmed two fundamental limits on sovereign immunity. The first such limit is that states may be sued with their express consent in accordance with statutory enactments, and, also—consistent with its view that it is only the sovereignty of the states themselves which the amendment protects—the Court specified that "the principle of sovereign immunity ... bars suits against States but not lesser entities." *Id.* at 756, 119 S.Ct. 2240. Hence, "[t]he immunity does not extend to suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the state." *Id.* This express limitation of Eleventh Amendment protection to only states and "arms of the state" has been recently reaffirmed by the high Court. *See Northern Ins. Co. of New York v. Chatham County, Ga.*, 547 U.S. 189, 193, 126 S.Ct. 1689, 164 L.Ed.2d 367 (2006) ("A consequence of this Court's recognition of preratification sovereignty as the source of immunity from suit is that only States and arms of the State possess immunity from suits authorized by federal law.").

In accordance with these principles of federalism, which respect the dual roles of the federal and state government in our system of constitutional governance, the high Court has specified that the issue of whether an entity is an arm of the state such that it is " 'one of the United States' within the meaning of the Eleventh Amendment, is a question of federal law." *Regents*, 519 U.S. at 429 n. 5, 117 S.Ct. 900. However, the Court has concomitantly emphasized that this federal question can only be answered after considering the provisions of state law that define the entity's "character." *Id.* The Court's analysis in this regard has evolved over the last eight decades from one that considers only the relative importance of particular state law factors relating to an entity's structure and powers, to one that, while still considering how the entity is structured under state law, now gives primacy to

consideration of the state sovereignty interests which the Court recognizes the Eleventh Amendment as protecting.

The term "arm or alter ego of the state," which SEPTA claims to be, was first used by the high Court in analyzing whether a particular entity was sufficiently independent from its creating state so as to be considered a citizen for purposes of establishing federal diversity jurisdiction. In *State Highway Comm'n of Wyoming v. Utah Const. Co.*, 278 U.S. 194, 199, 49 S.Ct. 104, 73 L.Ed. 262 (1929), the Court examined the structure of the State Highway Commission of Wyoming and concluded it could not be considered a citizen since it was but "the arm or alter ego of the state." The Court noted that the commission was merely an entity through which the state acted to contractually obligate itself to a private party, "as it might through any officer," that it had no funds of its own, no ability to respond to a suit with damages, nor did any of its members have personal liability for the actions of the commission. *Id.* at 199, 49 S.Ct. 104. Thus, the Court deemed a suit against the commission to be, "in effect, against the state of Wyoming." *Id.*

In *Moor v. Alameda County*, 411 U.S. 693, 719, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), also a federal diversity case, a California county asserted that it could not be deemed a citizen, since it was "nothing more than an agent or a mere arm of the State itself." In support, the county chiefly relied on a provision of the California Constitution specifying that a county was considered a "legal subdivision" of the state. *Id.* The high Court, however, found this one factor insufficient, in and of itself, to be determinative of whether the county was an arm of the state of California. The Court, instead, examined a group of factors involving how the county was treated under California law which it viewed as "persuasive indicia" of its independent status from the state of California. 411 U.S. at 720, 93 S.Ct. 1785. These factors included California statutes specifying various powers and duties of counties, including: the county's ability to sue and be sued in its own right as a separate corporate entity; its exclusive liability for judgments against it and its power to raise taxes to pay such judgments;

its right to engage in legal transactions—in its own capacity—such as entering contracts and buying property; the county's authority to provide public services; and its ability to issue bonds in its own name and for which the state was not obligated. The Court also referenced a decision of the California Supreme Court holding that the county was a separate corporate body inferior in legal status to the state, such that the state could compel it to pay certain funds. The Court ultimately concluded, based on consideration of all of these factors together, that the county was sufficiently independent of the state to treat it as a separate citizen for purposes of diversity jurisdiction.

The first case under the Eleventh Amendment in which the Court examined the structure and powers of a state-created entity established by state law—a school board—in order to determine whether it was an arm of the state entitled to claim Eleventh Amendment immunity, was *Mt. Healthy, supra.* In that case, the high Court remarked, as a general proposition, that the resolution of the issue of whether an entity is an arm of the state for Eleventh Amendment purposes "depends, at least in part, upon the nature of the entity created by state law." *Mt. Healthy,* 429 U.S. at 280, 97 S.Ct. 568. As a result, the Court focused on the statutory classification of the school board within the governmental structure of Ohio, the degree of control the state exercised over the school board, and the powers of the school board to raise revenue. The Court found that the school board was statutorily considered a political subdivision which, under Ohio law, was not deemed part of the state. While the Court acknowledged that the state provided "some guidance" through the state board of education and, also, that the school board received a "significant amount of money from the [s]tate," the Court gave greater weight to the fact that the school board had "extensive" power to issue bonds and levy taxes. *Id.* Consequently, the Court deemed the school board "more like a county or city than ... an arm of the State," and, thus, not entitled to assert Eleventh Amendment immunity. 429 U.S. at 280, 97 S.Ct. 568.

Two years later, in *Lake Country, supra,* the high Court articulated additional factors to be used to assess an entity's claim that it was an arm of the state entitled to the protections of the Eleventh Amendment. In that case, the entity at issue was a regional land use planning agency for the Lake Tahoe basin created jointly by the states of Nevada and California through an interstate compact approved by Congress. The high Court found that the agency was not entitled to Eleventh Amendment immunity. In so determining, the Court reminded that it had never construed the Eleventh Amendment to extend to entities such as counties and municipalities, merely because those entities exercised "a slice of state power." 440 U.S. at 400, 99 S.Ct. 1171. Noting the language of the Amendment conferred immunity only on "one of the United States," the Court emphasized that it was important to consider how the creating states had explicitly structured the entity under the interstate compact, opining that "[u]nless there [was] good reason to believe that the States structured the new agency to enable it to enjoy the special constitutional protection of the States themselves, and that Congress concurred in that purpose, there would appear to be no justification for reading additional meaning into the limited language of the Amendment." *Id.*

In concluding that the agency's creating states did not intend to bestow their sovereign immunity on the agency, the Court highlighted the following six factors: (1) the agency's description in the interstate compact described it as a "separate legal entity" and "political subdivision;" (2) the majority of the agency's governing board was appointed by counties and cities, not the states; (3) funding was required by the compact to be provided by the cities and counties, not the states; (4) none of the monetary obligations incurred by the agency were binding on the creating states; (5) the core function of the agency—to regulate land use—was a function normally performed by local government; and (6) even though the agency had originally been created by the government of both states, neither state possessed any continuing ability to veto actions taken by the agency, which had the authority to

make rules regarding land development practices within its jurisdiction. 440 U.S. at 401, 99 S.Ct. 1171.

Application of the *Lake Country* test proved difficult for courts to utilize, however, in instances when some of the six factors pointed to different conclusions. Indeed, in the most notable instance the Second and Third Circuits came to opposite determinations in applying the test to an identical entity, the Port Authority Trans Hudson Corporation ("Port Authority")—which was an authority created by interstate compact between New York and New Jersey to operate a commuter railroad between those two states.[16] In its 1994 *Hess* decision, the high Court resolved this split between the Second and Third Circuits, and articulated an alternative analysis to be used whenever the *Lake Country* factors do not uniformly point to one conclusion about whether a particular entity should be deemed an arm of the state. This analysis laid the foundation for the two paramount considerations propelling the high Court's modern Eleventh Amendment jurisprudence of *Seminole Tribe*, and *Alden*, discussed *supra*—namely, the protection of a state's dignity as an independent sovereign and the safeguarding of a state treasury from involuntary depletion through private suits.

In *Hess*, two injured employees sued the Port Authority under FELA in federal court in New Jersey, but the suit was dismissed by the district court on the basis of its finding that the Port Authority was entitled to Eleventh Amendment immunity from such claims, and the dismissal was upheld by the Third Circuit. In assessing whether the Port Authority was entitled to Eleventh Amendment immunity, the Court[17] began, as it did in *Lake Country*, by considering whether the Port Authority was specifically structured to enjoy the Eleventh Amendment protection of its creating states. The Court

16. *Compare Feeney v. Port Auth. Trans–Hudson Corp. (PATH)*, 873 F.2d 628, 630–31 (2d Cir.1989), *aff'd on other grounds, PATH v. Feenev*, 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990), *with Port Auth. Police Benevolent Ass'n. v. PATH*, 819 F.2d 413 (3d Cir.1987).

17. *Hess* was a 5–4 decision with the majority opinion written by Justice Ginsburg and joined by Justices Stevens, Kennedy, Souter and Breyer.

observed that, unlike in *Lake Country,* the indicators of immunity did not all point in one direction.

First, even though the majority of commissioners of the authority (8 of 12) were required to be local residents of the district served by the authority, this did not establish local control since the commissioners were all state appointees, the governors of each state had the power to block actions taken by the authority, and the respective legislatures of both states could enlarge the authority and add to its responsibilities. Second, while neither the compact nor the enabling legislation which created the Port Authority characterized it as a state agency, decisions of state courts treated it as such. Third, the Court stated that the nature of the functions provided by the Port Authority—i.e. owning and operating bridges, tunnels, ferries, marine terminals, airports, bus terminals, industrial parks and commuter railroads—did not aid its Eleventh Amendment analysis because such activities were conducted by both states and local municipal governments and, thus, were not the exclusive province of either type of entity. Fourth, the states which created the Port Authority had no financial responsibility for it, due to the fact it was created as a financially independent entity with private funds and, because it generated its own revenue through its operations, it received no money from its creating states. Finally, the Court found the states had "no legal liability for Port Authority debts; they are not responsible for the payment of judgments against the Port Authority." *Hess,* 513 U.S. at 46, 115 S.Ct. 394.

The Court then delineated the manner in which it would proceed with an Eleventh Amendment analysis under such circumstances, declaring: "[w]hen indicators of immunity point in different directions, the Eleventh Amendment's twin reasons for being remain our prime guide," i.e., to accord states the respect owed them as sovereign entities and to protect states from financial ruin. *Hess,* 513 U.S. at 47, 115 S.Ct. 394. The Court first considered the impact to the dignity of the states of New York and New Jersey by allowing such suits against the Port Authority in federal court, and

found "no genuine threat" to either state's dignity by such suits. *Id.* The Court relied on its conclusion that federal courts were "not alien to a bistate entity Congress participated in creating[,] nor is it disrespectful to one State to call upon the Compact Clause entity to answer complaints in federal court." *Id.*

In its discussion of the second principal aim of the Eleventh Amendment—protecting a state from financial harm by adverse judgments—the Court first considered and then rejected the Port Authority's argument that it was a state agency simply because the myriad of structural factors set forth above established state control of it. The Court emphasized that state control of an entity was not dispositive of such status, since focusing on control "does not home in on the impetus for the Eleventh Amendment: the prevention of federal-court judgments that must be paid out of a State's treasury." *Hess*, 513 U.S. at 48, 115 S.Ct. 394. The Court found that such concerns were not implicated since the Port Authority was financially independent from the states, generated its own revenue, and paid its own debts. Critically, the Court reminded that making this determination was not to be a mere accounting exercise:

> The proper focus is not on the use of profits or surplus, but rather is on losses and debts. If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is "No"—both legally and practically— then the Eleventh Amendment's core concern is not implicated.

*Hess*, 513 U.S. at 51, 115 S.Ct. 394. The Court then noted that neither state was responsible for the Port Authority's debt, and that a judgment against the Port Authority could not be enforced against either state. As a result, the Court concluded that "[r]equiring the Port Authority to answer in federal court to injured railroad workers who assert a federal statutory right, under the FELA, to recover damages does not touch the concerns—the States' solvency and dignity—that

underpin the Eleventh Amendment." 513 U.S. at 52, 115 S.Ct. 394.

Although the Court in *Hess* used the conjunctive phrase "legally and practically" when referring to the obligation of the state to pay the debts of the entity it had created, courts differed over whether both the legal and practical financial liability of the state for a judgment against the entity had to be demonstrated in order to show that the entity was entitled to claim sovereign immunity under the Eleventh Amendment, or whether a demonstration of either factor individually was sufficient. Thus, three years after its decision in *Hess,* the high Court accepted review in *Regents, supra,* to consider that question.

In *Regents,* the University of California was sued in federal court for breach of an employment contract, and the university claimed it was an arm of the state of California entitled to sovereign immunity under the Eleventh Amendment. The plaintiffs argued that the university was not entitled to sovereign immunity since it would be indemnified for any judgment against it by the federal government, pursuant to contract, and, thus, the state would not, as a practical matter, have to pay any judgment against it. The United States Supreme Court, in resolving this question, underscored, however, that it is the legal liability of the state for an adverse judgment against the entity which is the dispositive factor for purposes of determining whether the entity is an arm of the state entitled to claim Eleventh Amendment immunity:

> Just as with the arm-of-the-state inquiry … it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant. Surely, if the sovereign State of California should buy insurance to protect itself against potential tort liability to pedestrians stumbling on the steps of the State Capitol, it would not cease to be 'one of the United States.'

*Regents,* 519 U.S. at 431–432, 117 S.Ct. 900. So, even though a judgment against the university would have no actual impact on the treasury of California due to the federal government's

indemnification, the Court found that the Eleventh Amendment, nonetheless, applied to bar the suit as the Court found that it protected the state from the **risk** of an adverse judgment against it.

Since *Regents,* the high Court has not specifically altered its Eleventh Amendment arm-of-the-state test, and, indeed, has continued to look to *Lake Country* and *Hess* as guideposts for making a determination regarding an entity's arm-of-the-state status. *See Auer v. Robbins,* 519 U.S. 452, 456, n. 1, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (citing *Lake Country* and *Hess* in finding that St. Louis Board of Police Commissioners was not an arm of the state of Missouri, since the city was solely responsible for the liabilities of the board and the board was not under the state's direction or control). Nevertheless, in situations where the *Lake Country* factors do not point uniformly to one conclusion, the high Court's subsequent decision in *Federal Maritime, supra,* suggests that the factor regarded in *Hess* and *Regents* as having the greatest importance in ascertaining whether an entity should be accorded arm of the state status—whether the state is legally liable for the judgment against the entity—is no longer predominant.

In its 2002 decision in *Federal Maritime,* a majority of the high Court,[18] in concluding that the Eleventh Amendment barred a federal administrative agency from subjecting the South Carolina Ports Authority to an adjudicative proceeding commenced by a private party, endorsed the alternative view that the "preeminent" or "central" purpose of the doctrine of sovereign immunity is to accord the States their due respect as sovereign entities. *Federal Maritime,* 535 U.S. at 760, 765, 122 S.Ct. 1864. Although the high Court was not enunciating an arm-of-the-state test in *Federal Maritime,* since the status of the entity being sued as an arm of the state was not disputed,[19] this articulation was a clear affirmation by the high Court that preservation of the inherent dignity of the state is

18. Justice Thomas authored the majority opinion which was joined by then Chief Justice Rehnquist, and Justices O'Connor, Kennedy and Scalia.

19. *Federal Maritime,* 535 U.S. at 751 n. 6, 122 S.Ct. 1864.

now, as a general matter, the paramount consideration in any matter involving the determination of the scope of protection afforded by the Eleventh Amendment, whenever the *Lake Country* factors do not uniformly support a conclusion regarding an entity's status. However, in conducting this analysis, whether the state is legally liable for a judgment against the entity remains a consideration, since the high Court in *Federal Maritime* continued to recognize, as it had previously emphasized in *Seminole Tribe,* and *Alden,* that protection of the state treasury remains an important purpose served by the Eleventh Amendment.[20] *See Federal Maritime,* 535 U.S. at 765, 122 S.Ct. 1864 (reaffirming principle that "state sovereign immunity serves the important function of shielding state treasuries and thus preserving 'the States' ability to govern in accordance with the will of their citizens.'" (quoting *Alden,* 527 U.S. at 750–51, 119 S.Ct. 2240)).

## B.

 Reading these decisions of the high Court in concert with one another, we discern the following principles governing our determination of whether SEPTA is an arm of the

20. The Third Circuit's arm-of-the-state test incorporates many of the same considerations articulated in *Lake Country* and *Hess,* along with additional factors. *See Fitchik,* 873 F.2d at 659. *Fitchik* reaffirmed that the "most important" factor remained whether any judgment against the entity would be paid from the state treasury which was consistent with the view of the high Court at that time that the central purpose of the amendment was to protect the state treasury against federal judgments. However, in the aftermath of *Regents* and *Federal Maritime,* the Third Circuit, while continuing to utilize the *Fitchik* test, regards the high Court's holdings in those cases as requiring alteration of the application of the test such that consideration of the impact of a judgment on the state treasury should no longer be accorded primacy. Thus, the Third Circuit now assigns equal weight to all of its *Fitchik* factors in conducting its arm-of-the-state analysis. *See Cooper,* 548 F.3d at 301 ("We still consider all three [*Fitchik*] factors relevant in assessing whether an entity warrants Eleventh Amendment protection, but none is predominant.").

As recognized by the parties, other circuits, post *Hess* and *Regents,* also continue to utilize their own varying multi-factor tests. *See e.g. S.J. v. Hamilton County Ohio,* 374 F.3d 416 (6th Cir.2004) (applying four-factor test); *Beentjes v. Placer County,* 397 F.3d 775 (9th Cir.2005) (applying five-factor test); *Black v. North Panola School District,* 461 F.3d 584 (5th Cir.2006) (applying six-factor test).

Commonwealth of Pennsylvania "and therefore 'one of the United States' within the meaning of the Eleventh Amendment." *Regents,* 519 U.S. at 429 n. 5, 117 S.Ct. 900. Pursuant to *Mt. Healthy, Lake Country,* and *Hess,* we must first examine the various "indicators of immunity" delineated in those cases as they relate to the organizational structure, powers, and obligations of SEPTA under Pennsylvania law, in order to determine if, uniformly, they indicate SEPTA was "structured . . . to enable it to enjoy the special constitutional protection of the [Commonwealth.]" *Lake Country,* 440 U.S. at 401, 99 S.Ct. 1171. These indicators include:

(1) the legal classification and description of SEPTA within the governmental structure of Pennsylvania, both statutorily and under our caselaw;

(2) the degree of control the Commonwealth exercises over the SEPTA Board, both through the power of appointment, and the power to subsequently veto its actions;

(3) the power of the SEPTA Board to independently raise revenue on its own;

(4) the degree of funding provided by the five counties SEPTA serves relative to that provided by the Commonwealth;

(5) whether any monetary obligation incurred by SEPTA is binding on the Commonwealth; and

(6) whether the core function of SEPTA—providing public transportation services—can be categorized as a function which is normally performed by local government or state government.

*See Mt. Healthy,* 429 U.S. at 280–281, 97 S.Ct. 568 (describing classification of entity and conferral of powers under state statutes); *Lake Country,* 440 U.S. at 401, 99 S.Ct. 1171 (setting forth six relevant factors in determining whether entity was arm of creating states); *Hess,* 513 U.S. at 44–46, 115 S.Ct. 394 (beginning its arm-of-the-state analysis by examining six indicators of immunity set forth in *Lake Country* ). Since the high Court has not indicated that any one of these indicators of immunity is dispositive, or is to be given special

weight, we must regard them as being of equal importance.[21] If these indicators of immunity do not all point towards the same conclusion, *Hess, Regents,* and *Federal Maritime* require us to then address, primarily, whether a FELA suit against SEPTA would offend the dignity of the Commonwealth of Pennsylvania, and, secondarily, whether the Commonwealth has any actual legal liability for FELA suits against SEPTA.

■ With respect to the first of these six *Lake Country/Hess* indicators of immunity—how SEPTA is classified under Pennsylvania law—we look to its enabling statute, the MTAA, which provides:

An authority shall in no way be deemed to be an instrumentality of any city or county or other municipality or engaged in the performance of a municipal function, but shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof.

74 Pa.C.S.A. § 1711(a). It further provides:

It is hereby declared to be the intent of the General Assembly that an authority created or existing under this chapter ... shall continue to enjoy sovereign and official immunity.

*Id.* § 1711(c)(3) (emphasis added). We agree with SEPTA that this language establishes that SEPTA has been statutori-

21. In this respect, we agree with Appellants that statutory provisions and interpretive decisions of our Court, in and of themselves, do not establish SEPTA's sovereign immunity for purposes of the Eleventh Amendment. As then Judge, now Justice, Alito observed in *Bolden,* acceptance of the proposition that a state could determine the scope of its sovereign immunity via statutory designation alone "would revolutionize the meaning of the Eleventh Amendment," as "each state legislature apparently could confer Eleventh Amendment protection on any entity that it wished, including counties and cities, by enacting a statute clothing these entities with 'sovereign immunity' from suit on state claims." *Bolden,* 953 F.2d at 818 (citing *Howlett, supra.*) Doing so would conflict with the high Court's determination that a state's immunity from suit is not externally bestowed by legislative or constitutional fiat, but is rather "a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today ... except as altered by the plan of the Convention or certain constitutional Amendments." *Alden,* 527 U.S. at 713, 119 S.Ct. 2240.

ly classified by the legislature as an agency of the Commonwealth. *See, e.g., Feingold v. SEPTA,* 512 Pa. 567, 578–579, 517 A.2d 1270, 1276 (1986) (concluding that, under the former version of the MTAA, "SEPTA was intended to be considered an agency of the Commonwealth"); *Tulewicz v. SEPTA,* 529 Pa. 588, 595–96, 606 A.2d 427, 430 (1992) (citing *Feingold,* to hold SEPTA could rely on the statutory cap on recoverable damages "to the same extent as would the Commonwealth"); *SEPTA v. Board of Revision of Taxes,* 574 Pa. 707, 718, 833 A.2d 710, 716 (2003) (under Section 1711(a), SEPTA is considered "part of the sovereignty of the Commonwealth."). *But see Blount v. Philadelphia Parking Authority,* 600 Pa. 277, 286 n. 12, 965 A.2d 226, 232 n. 12 (2009) (observing that SEPTA's organizational and financial structure contain indicators that it is a local agency). Accordingly, the language of SEPTA's enabling statute, and the weight of our decisions construing it, establish that the first indicator of immunity points in favor of SEPTA being considered an arm of the Commonwealth.

■ Concerning the second indicator of immunity—the degree of control the Commonwealth exercises over SEPTA—we find this indicator points against finding that SEPTA is an arm of the Commonwealth. Here, 10 of the 15 members of the SEPTA Board—which is its "governing and policymaking body," and which possesses, *inter alia,* power over SEPTA's operating and capital budgets, its organizational structure, and selection of personnel—are appointed by the local governments of the five counties that comprise its service area. *See* 74 Pa.C.S.A. §§ 1712, 1713(a). Members of the Board appointed by those counties must be residents of those counties. *Id.* § 1713(a)(3). Only 5 of SEPTA's 15 Board members are appointed by the Commonwealth. 74 Pa.C.S.A. § 1713(a)-(c). The Commonwealth has no power to unilaterally remove a Board member which it did not appoint. *Id.* § 1714(a). Further, no provision of the MTAA confers upon either the governor or the state legislature the right to veto or otherwise unilaterally alter official actions taken by a majority of the SEPTA Board. The Commonwealth's ability to exercise its

official power over SEPTA Board actions is, thus, constrained by the limited proportional representation on SEPTA's Board afforded to the executive and legislative branches of the Commonwealth. Therefore, given this limited power of appointment and concomitant lack of ability of the Commonwealth to veto or officially alter Board action, the SEPTA Board cannot be deemed subject to state direction or control.

▉ Regarding the third indicator of immunity—whether SEPTA is empowered to independently raise revenue on its own—we find that SEPTA possesses independent ability to raise revenue which is not dependent on the approval or financial backing of the Commonwealth. SEPTA has the right to set fares for the payment of its capital or operating expenses, 74 Pa.C.S.A. § 1741(15), (16), to borrow money either through loans, or the issuance of bonds in the name of the authority, *Id.* § 1741(18), and "[t]o explore alternative means of raising revenue," including the solicitation of advertising for display on its vehicles, *Id.* § 1741(24). Consequently, this indicator also points against finding that SEPTA is an arm of the Commonwealth.

▉ With respect to the fourth indicator of immunity—the degree of funding provided by the five counties SEPTA serves relative to that provided by the Commonwealth—we find that this indicator points in favor of SEPTA as an arm of the Commonwealth. Although the parties dispute the precise level of funding the Commonwealth has historically provided SEPTA, and the amount of funding it will provide in the future pursuant to Act 44, it is not disputed that the five local counties SEPTA serves are now obligated by Act 44 to provide at least 15 percent of any matching funds which are provided from the state. 74 Pa.C.S.A. § 1513(d). Thus, under the current funding scheme established by Act 44, no matter what the annual amount of the Commonwealth's assistance to SEPTA, local governments' contributions will likely be at or near this minimum proportional level. *See id.* § 1513(d)(2) (requiring that, in the event that local matching funds fail to meet the 15% threshold in a given fiscal year,

those contributions must increase in subsequent fiscal years until the 15% threshold is reached). Accordingly, the Commonwealth's greater level of financial assistance to SEPTA relative to that provided by local governments under Act 44 weighs in favor of a finding that SEPTA is an arm of the Commonwealth.

▄▄▄▄ In relation to the fifth indicator of immunity—whether SEPTA may legally bind the Commonwealth for any debt or obligation—it is clear that it may not. Section 1741 of the MTAA provides:

> The authority shall have no power, at any time or in any manner, to pledge the credit or taxing power of the Commonwealth or any other government agency, nor shall any of the authority's obligations be deemed to be obligations of the Commonwealth or of any other government agency, nor shall the Commonwealth or any government agency be liable for the payment of principal or interest on such obligations.

74 Pa.C.S.A. § 1741(c). Thus, this indicator of immunity points against finding that SEPTA is an arm of the Commonwealth.

▄▄▄▄ The final indicator of immunity concerns whether SEPTA's core function—the provision of public transportation services—traditionally has been regarded as a state or local governmental function. This inquiry does not have a clear answer since, as evidenced by Pennsylvania's statutory scheme, both state and local governments share responsibilities in providing such services. Hence, merely because SEPTA provides public transportation services or, like the Port Authority in *Hess*, operates a commuter rail service between states, does not definitively point towards or away from a conclusion that it is an arm of the Commonwealth.

▄▄▄▄ Accordingly, as in *Hess*, the six immunity indicators do not all point towards the same conclusion regarding whether SEPTA may be deemed an arm of the Commonwealth, although a plurality point toward finding it is not. *Hess*, therefore, requires us to consider whether allowing

SEPTA to be sued under FELA in Pennsylvania courts would thwart the two principal purposes of the Eleventh Amendment, discussed *supra:* the protection of Pennsylvania's dignity as a sovereign state and the protection of Pennsylvania's state treasury against involuntary depletion from suits brought by private persons. In so doing, however, we are mindful of the high Court's most recent admonition in *Federal Maritime* that preservation of state dignity is the paramount purpose of the Eleventh Amendment.

As a result, we must first consider the question of whether FELA suits brought by private individuals against SEPTA in Pennsylvania courts offend the dignity of the Commonwealth of Pennsylvania. Although the high Court has never articulated a precise definition of the "dignity" interest of a state, as discussed previously, the Supreme Court's conceptualization of state dignity is inextricably linked with its recognition of a state's continuing status in our constitutional system of federalism as an independent sovereign entity which retains certain inherent rights that the federal government is required to honor. *See Federal Maritime,* 535 U.S. at 760, 122 S.Ct. 1864 ("The preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities."); *Alden,* 527 U.S. at 758, 119 S.Ct. 2240 ("When Congress legislates in matters affecting the States, it may not treat these sovereign entities as mere prefectures or corporations. Congress must accord States the esteem due to them as joint participants in a federal system."); *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) ("[T]he States, although a union, maintain certain attributes of sovereignty, including sovereign immunity. [The Eleventh Amendment] thus accords the States the respect owed them as members of the federation." (citation omitted)).

Consistent with this view, the high Court has suggested that the principal threat it perceives to a state's dignity as an independent sovereign arises from the danger of involuntarily requiring the state to participate in a court proceeding against it at the insistence of a private party, since this creates the

prospect that a state could be subjected, against its will, to the decrees and orders of a judicial tribunal. This could, in turn, impact its ability to perform its most fundamental duties of governance with respect to its citizens. As the high Court first explained over a century ago in *Ayers,* and has reaffirmed in its most recent Eleventh Amendment jurisprudence:

> The very object and purpose of the eleventh amendment were to prevent the indignity of subjecting a state to the coercive process of judicial tribunals at the instance of private parties. It was thought to be neither becoming nor convenient that the several states of the Union, invested with that large residuum of sovereignty which had not been delegated to the United States, should be summoned as defendants to answer to complaints of private persons, whether citizens of other states or aliens, or that the course of their public policy and the administration of their public affairs should be subject to and controlled by the mandates of judicial tribunals, without their consent, and in favor of individual interests.

*Ayers,* 123 U.S. at 505, 8 S.Ct. 164; *Alden,* 527 U.S. at 749, 119 S.Ct. 2240 ("Private suits against nonconsenting States ... present 'the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'") (quoting *Ayers,* 123 U.S. at 506, 8 S.Ct. 164); *see also Sossamon v. Texas,* —— U.S. ——, 131 S.Ct. 1651, 1657, 179 L.Ed.2d 700 (2011) ("Immunity from private suits has long been considered central to sovereign dignity." (internal quotation marks and citation omitted)).

In *Alden,* the high Court further elaborated on the specific nature of the threat to a state's sovereign dignity it perceived as arising whenever a private suit is brought against a state in its own courts under federal law:

> Not only must a State defend or default but also it must face the prospect of being thrust, by federal fiat and against its will, into the disfavored status of a debtor, subject to the power of private citizens to levy on its treasury or perhaps even government buildings or property which the State administers on the public's behalf.... A power to press a

State's own courts into federal service to coerce the other branches of the State, furthermore, is the power first to turn the State against itself and ultimately to commandeer the entire political machinery of the State against its will and at the behest of individuals. Such plenary federal control of state governmental processes denigrates the separate sovereignty of the States.

*Alden*, 527 U.S. at 749, 119 S.Ct. 2240 (citation omitted).

When a suit against SEPTA is brought in Pennsylvania's courts under FELA, however, no such threats to the sovereign dignity of the Commonwealth are presented. In such a suit, the Commonwealth is not a named defendant, as SEPTA has been designated by the legislature of the Commonwealth as a distinct legal entity with the power to sue and be sued in its own capacity. *See* 74 Pa.C.S.A. § 1701 (defining an authority as a "body corporate and politic"); 74 Pa.C.S.A. § 1741 (granting an authority the power to sue and be sued). Thus, it is not any purported negligent act of the Commonwealth at issue in a FELA suit, but, rather, the alleged negligent act of SEPTA itself. Neither can the Commonwealth be joined as a defendant in any FELA action against SEPTA since the Commonwealth has specifically repudiated any legal responsibility for obligations incurred by SEPTA; hence, having explicitly disclaimed all responsibility for any financial liability incurred by SEPTA, it may not be joined in a FELA suit against SEPTA under our rules of civil procedure. *See* Pa. R.C.P. 1706.1, 2252(a)(1), (4) (allowing joinder by plaintiff or defendant in a civil action of only those parties which are solely liable to the plaintiff, liable to the joining party, or jointly or severally liable with the joining party on the plaintiff's cause of action). Further, the Commonwealth does not enter its appearance to defend a FELA suit on SEPTA's behalf, and it does not otherwise participate in the litigation, as the legislature has explicitly placed the responsibility on SEPTA to manage all of its own legal affairs, which responsibility includes the defense of any suits against it. *See* 74 Pa.C.S.A. § 1722(a) (establishing a legal division which "shall administer the legal affairs of the authority, shall prosecute

and defend, settle or compromise all suits or claims for and on behalf of the authority."). In sum, then, SEPTA bears the sole and exclusive burden of any FELA litigation against it in our state courts.

■ Because a FELA suit against SEPTA in the courts of common pleas of this Commonwealth proceeds against SEPTA, alone, as a wholly independent entity without the involvement of the Commonwealth, the Commonwealth cannot, therefore, be subject to any decree or order of court as the result of such a suit. Thus, no right or interest of the Commonwealth will be affected by the outcome of a FELA suit against SEPTA in our Commonwealth's courts, and so a FELA suit poses no danger that the Commonwealth will be involuntarily "subject to and controlled by the mandates of judicial tribunals," without its consent, "at the instance of private parties." *Ayers*, 123 U.S. at 505, 8 S.Ct. 164. Accordingly, we conclude that a FELA action against SEPTA in our courts does not subject the Commonwealth to any indignity. Under *Federal Maritime*, therefore, the answer to the preeminent inquiry concerning state dignity supports the conclusion that SEPTA is not an arm of the Commonwealth.

■ This conclusion is buttressed by what remains a secondary inquiry—the impact a FELA judgment against SEPTA would have on the Commonwealth's treasury.[22] *Hess; Federal Maritime, supra.* This inquiry cannot be reduced to a "formalistic question of ultimate financial responsibility," i.e. whether, as a practical matter, the judgment will be paid with state funds, *see Regents*, 519 U.S. at 431, 117 S.Ct. 900, but, instead, the focus must be on the actual legal liability of the state for a judgment against the entity it has created, since

---

**22.** As discussed, *supra,* the degree to which a financial obligation incurred by an entity is binding on the state which created it is also one of the six indicators of immunity set forth in *Lake Country*, which *Hess* requires be initially examined to determine whether an entity is an arm of the state. In that phase of the *Hess* analysis, this indicator is weighted coequally with the other indicators. However, if it has been determined that the indicators point in different directions, then *Hess* requires that the impact on the state treasury of private judgments under a federal statute be given heightened consideration.

that provides the best insight into the true nature of the "relationship between the State and its creation." *Id.* As a result, we must examine whether the Commonwealth is legally liable for any judgment rendered against *SEPTA.* *Accord Benn v. First Judicial District,* 426 F.3d 233, 239–240 (3d Cir.2005) (recognizing that, for purposes of its arm-of-the-state analysis, *Regents* requires consideration of a state's potential legal liability for a judgment against the entity, rather than the state's actual financial liability).

As our discussion above establishes, the Commonwealth has no legal liability for a FELA judgment rendered against SEPTA. *See* 74 Pa.C.S.A. § 1741(c). Indeed, the Commonwealth has conceded this point in its amicus brief. Commonwealth Brief at 9. However, the Commonwealth and SEPTA focus extensively on what they allege to be the practical effects of FELA judgments on the Commonwealth treasury,[23] yet such considerations are irrelevant to this inquiry under the high Court's jurisprudence. After *Regents,* the controlling question is whether the Commonwealth would be **legally** liable to pay any additional FELA claims, in the event they would overwhelm SEPTA's ability to satisfy such judgments out of its own funding reserves, or the revenue generated through fares it sets. The answer to that question is, quite simply, no.

While it is clear that, through Act 44, the Commonwealth **voluntarily** undertook to provide additional financial support to municipal transit systems such as SEPTA, there is no provision in that Act, or any subsequent legislative enactment, which **requires** the Commonwealth to cover any shortfalls in SEPTA's operational budget. As the Supreme Court established in *Hess,* the mere prospect that a state

---

**23.** Both the Commonwealth and SEPTA argue that the funding relationship established by Act 44 has transformed their relationship, and they raise the specter that exposure to a "multitude" of FELA claims would conceivably "impact the Commonwealth's treasury and injure[ ] the Commonwealth itself." SEPTA Brief at 21. SEPTA, however, has pointed to nothing of record which supports a conclusion that it will likely be subjected to a voluminous number of FELA claims in the future, and, indeed, the record evidence of the historical number and amount of such FELA claims cited by Appellants belies that assertion. *See supra* at note 10.

might render financial assistance to cover an unforeseen budgetary shortfall of an entity it created does not create a legal obligation of the state to pay. Thus, since the Commonwealth is not legally required under current law to pay any FELA judgment against SEPTA, we conclude this aspect of the *Hess* test likewise compels the conclusion that SEPTA is not an arm of the Commonwealth of Pennsylvania.

 In sum, we discern no threat to the dignity of the Commonwealth of Pennsylvania whenever a private individual commences a FELA suit in the courts of this Commonwealth, nor do we find the treasury of the Commonwealth to be threatened by a FELA suit in our courts. Accordingly, we conclude SEPTA is not an arm of the Commonwealth of Pennsylvania, and thus not entitled to claim immunity under the Eleventh Amendment.[24]

The order of the Commonwealth Court is reversed, and these cases are remanded to the Commonwealth Court for remand to the Court of Common Pleas of Philadelphia for further proceedings. Jurisdiction relinquished.

Justice ORIE MELVIN did not participate in the decision of this case.

Chief Justice CASTILLE and Justices SAYLOR, EAKIN, BAER and McCAFFERY join the opinion.

---

24. SEPTA's ancillary motion to delay decision in this case pending supplemental briefing regarding the Supreme Court's decision in *National Federation of Independent Business v. Sebelius*, —— U.S. ——, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012), is hereby denied, as our review of that decision indicates it does not impact our resolution of the issues in this appeal.