**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| CEDRIC GALETTE | : | No. 4 EAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Superior Court entered on March 21, |
| | : | 2023, at No. 2210 EDA 2021, |
| | : | affirming the Order of the Court of |
| NJ TRANSIT AND JULIE E. MCCREY | : | Common Pleas of Philadelphia |
| | : | County, Civil Division, entered on |
| | : | September 27, 2021, at |
| APPEAL OF: NJ TRANSIT | : | No. 2008000610. |
| | : | |
| | : | ARGUED: September 11, 2024 |

## OPINION

**JUSTICE BROBSON**                                   **FILED: March 12, 2025**

Appellee Cedric Galette (Galette) initiated a negligence action against Julie McCrey (McCrey) and Appellant New Jersey Transit (NJ Transit) in the Court of Common Pleas of Philadelphia County (trial court). NJ Transit is an "instrumentality" of the State of New Jersey under New Jersey law. N.J. Stat. Ann. § 27:25-4(a). Based upon this status, NJ Transit filed a motion to dismiss Galette's suit, invoking the doctrine of interstate sovereign immunity. The trial court denied the motion, and, on appeal, the Superior Court affirmed, holding that NJ Transit is not an instrumentality or arm of the State of New Jersey and, therefore, is not entitled to the protections provided by sovereign immunity.[1] This Court granted allowance of appeal to determine whether the United

---

[1] The case law in this area often uses the words "instrumentality" and "arm" interchangeably. Other courts also invoke the term "alter ego" to mean the same thing (continued…)

States Supreme Court's decision in *Franchise Tax Board of California v. Hyatt*, 587 U.S. 230 (2019) (*Hyatt III*), compels a conclusion that interstate sovereign immunity bars Galette's suit against NJ Transit. Because we answer this question in the affirmative, we reverse the Superior Court's judgment, which results in the dismissal of Galette's suit against NJ Transit.

## I. Background

Galette filed a civil complaint in the trial court, naming NJ Transit and McCrey as defendants. In the complaint, Galette averred that, on August 9, 2018, he was a passenger in a vehicle operated by McCrey "when NJ Transit struck the vehicle," while the vehicle was stopped on Market Street in Philadelphia, Pennsylvania. (Complaint, 5/26/2021, at ¶5.) Galette alleged that NJ Transit and McCrey were negligent in several respects and that their negligence caused him to suffer physical injuries.

NJ Transit filed an answer with new matter to the complaint, as well as a cross-claim against McCrey. Relevant to this appeal, NJ Transit alleged in its new matter that it is an arm of the State of New Jersey entitled to the protections of sovereign immunity. NJ Transit subsequently filed a motion to dismiss Galette's action.

In its motion to dismiss, NJ Transit relied on the United States Supreme Court's decision in *Hyatt III* for the proposition that "States retain their sovereign immunity from private suits brought in the courts of other States."[2] (Motion to Dismiss, 7/16/2021, at ¶19 (quoting *Hyatt III*, 587 U.S. at 236) (emphasis omitted).) NJ Transit further highlighted

as "instrumentality" and "arm." In this opinion, we utilize "instrumentality" and "arm" interchangeably to mean a State-created entity "such that a suit brought against" the entity "would be, for all practical purposes, a suit against the [S]tate itself." *Goldman v. Se. Pennsylvania Transp. Auth.*, 57 A.3d 1154, 1171 (Pa. 2012).

[2] Prior to *Hyatt III*, the United States Supreme Court issued two opinions addressing the same litigation that led to the High Court's decision in *Hyatt III*: *Franchise Tax Board of California v. Hyatt*, 538 U.S. 488 (2003) (*Hyatt I*), and *Franchise Tax Board of California v. Hyatt*, 578 U.S. 171 (2016) (*Hyatt II*). Those decisions do not impact this appeal.

that the United States Court of Appeals for the Third Circuit has concluded that NJ Transit is an arm of the State of New Jersey and is "entitled to claim the [immunity] protections of the Eleventh Amendment [of the United States Constitution], which in turn functions as an absolute bar to any claims . . . against NJ Transit."[3]  (*Id.* at ¶25 (quoting *Karns v. Shanahan*, 879 F.3d 504, 519 (3d Cir. 2018)).)  The trial court denied the motion to dismiss, and NJ Transit appealed to the Superior Court.

In a published opinion, a three-judge panel of the Superior Court affirmed the trial court's order.  *Galette v. NJ Transit*, 293 A.3d 649 (Pa. Super. 2023).  After providing a background regarding State sovereign immunity, the Superior Court recognized that, in *Hyatt III*, the United States Supreme Court expressed that "[i]nterstate sovereign immunity is . . . integral to the structure of the Constitution" and that "States retain their sovereign immunity from private suits brought in courts of other States."  *Id.* at 654-55 (quoting *Hyatt III*, 587 U.S. at 246, 236).  The Superior Court further acknowledged that sovereign immunity extends to instrumentalities of the States.  The Superior Court, however, rejected the notion that NJ Transit is an instrumentality of the State of New Jersey.

In concluding that NJ Transit is not an arm of the State of New Jersey, the Superior Court pointed out that, for purposes of Eleventh Amendment jurisprudence, this Court in *Goldman* held that a six-factor test can assist in determining whether a State-created entity operates as the State itself.[4]  Those factors are as follows:

---

[3] The Eleventh Amendment of the United States Constitution provides:  "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.

[4] The Superior Court refused to rely upon the Third Circuit's conclusion in *Karns* that NJ Transit is an arm of the State of New Jersey.  In support of this decision, the Superior Court highlighted, *inter alia*, that holdings of the Third Circuit are not binding on the courts of this Commonwealth.  *Galette*, 293 A.3d at 655-56 (citing *Werner v. Plater-Zyberk*, 799 A.2d 776, 782 (Pa. Super. 2002)).

(1) the legal classification and description of the entity within the governmental structure of the State, both statutorily and under its caselaw; (2) the degree of control the State exercises over the entity; (3) the extent to which the entity may independently raise revenue; (4) the extent to which the State provides funding to the entity; (5) whether the monetary obligations of the entity are binding upon the State; and (6) whether the core function of the entity is normally performed by the State.

*Id.* at 655 (citing *Goldman*, 57 A.3d at 1179).

The Superior Court concluded that the first, second, and sixth factors support NJ Transit's position that it is an arm of the State of New Jersey but that the third, fourth, and fifth factors weigh in favor of finding the opposite. The Superior Court then reported that, because this six-factor test did not resolve whether NJ Transit qualifies as an instrumentality of New Jersey, the court was required to consider whether allowing NJ Transit to be sued under these circumstances would thwart the primary purposes of the Eleventh Amendment: protecting the States' sovereign dignity and treasuries. The Superior Court ultimately held that NJ Transit is not an arm of the State of New Jersey because, like the entity at issue in *Goldman*, a private lawsuit against NJ Transit does not threaten the sovereign dignity nor the treasury of the State that created it.

## II. Issues

This Court granted NJ Transit's petition for allowance of appeal, limited to the following issues:

(1) Whether guidance by this Court is necessary when the Superior Court issued an opinion that [NJ] Transit is not an arm of the State of New Jersey, conflicting with its own prior decision in *Flamer v. New Jersey Transit Bus Operations*, 607 A.2d 260 (Pa. Super. 1992) and thereby creating inconsistent precedent?

(2) Whether guidance by this Court is necessary when the Superior Court disregarded the persuasive authority of *Karns v. Shanahan*, 879 F.3d 504 (3rd. Cir. 2018) and instead misinterpreted and misapplied *Goldman v. SEPTA*, 57 A.3d 1154 (Pa. 2012) to issue an opinion that [NJ] Transit is not an arm of the [S]tate of New Jersey and therefore not entitled to Eleventh Amendment Sovereign Immunity?

(3) Whether guidance by this Court is necessary because the issue of whether [NJ] Transit is an arm of the [S]tate of New Jersey entitled to Eleventh Amendment Sovereign Immunity under the United States Constitution in accordance with [*Hyatt III*] is an issue of first impression in this Court?

*Galette v. NJ Transit*, 313 A.3d 450 (Pa. 2024) (*per curiam*).[5]  These three issues focus on whether NJ Transit enjoys the protections of interstate sovereign immunity as an arm of the State of New Jersey in an action brought in a Pennsylvania court under Pennsylvania tort law.  As this question is purely legal in nature, our standard of review is *de novo*.  *Goldman*, 57 A.3d at 1170.

### III.  Discussion

The doctrine of sovereign immunity has its roots in English common law.  *Dorsey v. Redman*, 96 A.3d 332, 340 (Pa. 2014).  "The common-law rule was that no suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him."  *Hyatt III*, 587 U.S. at 238-39 (citation and internal quotation marks omitted).  Although the rule originally was designed to shield the English king from legal actions, sovereign immunity survived in the United States after it gained its independence from England.  Indeed, "the doctrine that a sovereign could not be sued without its consent was universal in the States when the Constitution was drafted and ratified."  *Alden v. Maine*, 527 U.S. 706, 715-16 (1999).  "An integral component of the States' sovereignty was their immunity from private suits."  *Hyatt III*, 587 U.S. at 238 (citation and internal quotation marks omitted).

With that said, however, it was not until the 1979 decision in *Nevada v. Hall*, 440 U.S. 410 (1979) (*Hall*), *overruled by Hyatt III*, that the United States Supreme Court

---

[5] This Court further directed the parties to address the Commonwealth Court's decision in *Marshall v. Southeastern Pennsylvania Transportation Authority*, 300 A.3d 537 (Pa. Cmwlth. 2023) (holding that, as arm of State of New Jersey, NJ Transit is entitled to protections of sovereign immunity under *Hyatt III* in private suit pursued in Pennsylvania court under Pennsylvania tort law).

directly addressed whether the federal Constitution dictates that a State's sovereign immunity protects it against private suits filed in the courts of its sister States. In *Hall*, the High Court "held that the Constitution does not bar private suits against a State in the courts of another State." *Hyatt III*, 587 U.S. at 236. "Instead, the Court concluded that the Founders assumed that 'prevailing notions of comity would provide adequate protection against the unlikely prospect of an attempt by the courts of one State to assert jurisdiction over another.'" *Id.* (quoting *Hall*, 440 U.S. at 419). Forty years later, the High Court expressly overruled *Hall* in *Hyatt III*, characterizing *Hall* as "irreconcilable with our constitutional structure." *Id.* at 249. In so doing, the High Court relied upon the overall design of the federal Constitution and "the understanding of sovereign immunity shared by the States that ratified the Constitution." *Id.* at 236.

The United States Supreme Court began its substantive analysis in *Hyatt III* by detailing the historical record regarding the role of State sovereign immunity in the United States after it secured its independence from England but before the ratification of the Constitution. The High Court reported that, during that period, "the States considered themselves fully sovereign nations." *Id.* at 237. The High Court explained:

> The Founders believed that both "common law sovereign immunity" and "law-of-nations sovereign immunity" prevented States from being amenable to process in any court without their consent. The common-law rule was that no suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him. The law-of-nations rule followed from the perfect equality and absolute independence of sovereigns under that body of international law.

*Id.* at 238-39 (some internal quotation marks and citations omitted). "The founding generation thus took as given that States could not be haled involuntarily before each other's courts." *Id.* at 239.

Next, the United States Supreme Court in *Hyatt III* explained how the ratification of the Constitution did and did not alter State sovereign immunity. By way of example,

the High Court highlighted that, under Article III of the federal charter, "the States . . . surrendered a portion of their immunity by consenting to suits brought against them by the United States in federal courts."[6]  *Id.* at 241.  The United States Supreme Court reported that, in *Chisholm v. Georgia*, 1 L.Ed. 440 (1793), one of the High Court's earliest decisions, the High Court erroneously concluded that Article III permitted a citizen of one State to sue another State in federal court.

According to the United States Supreme Court, its decision in *Chisholm* "precipitated an immediate 'furor' and 'uproar' across the country," resulting in "Congress and the States . . . act[ing] swiftly to remedy the Court's blunder by drafting and ratifying the Eleventh Amendment."  *Id.* at 242-43.  The High Court opined that "[t]he Eleventh Amendment confirmed that the Constitution was not meant to 'rais[e] up' any suits against the States that were 'anomalous and unheard of when the Constitution was adopted.'"  *Id.* at 243 (quoting *Hans v. Louisiana*, 134 U.S. 1, 18 (1890)).  In other words, the Eleventh Amendment made clear that, by ratifying the Constitution, the States did not consent to being sued in federal court by private citizens of sister States.  The High Court, however, emphasized that the sovereign immunity of the States "neither derives from, nor is limited by, the terms of the Eleventh Amendment."  *Id.* (quoting *Alden*, 527 U.S. at 713).

---

[6] Article III of the Constitution addresses the Judicial Branch of the federal government. In relevant part, Article III provides:

> The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

U.S. Const. art. III, § 2.

The United States Supreme Court then expressed that "the Constitution affirmatively altered the relationships between the States, so that they no longer relate to each other solely as foreign sovereigns." *Id.* at 245. According to the High Court, "[e]ach State's equal dignity and sovereignty under the Constitution implies certain constitutional limitation[s] on the sovereignty of all of its sister States." *Id.* (citation and internal quotation marks omitted). The High Court observed that "[o]ne such limitation is the inability of one State to hale another into its courts without the latter's consent." *Id.* The High Court explained that the "Constitution does not merely allow States to afford each other immunity as a matter of comity; it embeds interstate sovereign immunity within the constitutional design." *Id.*

Further outlining how interstate sovereign immunity operates under the Constitution, the United States Supreme Court noted that the "Constitution . . . reflects implicit alterations to the States' relationships with each other, confirming that they are no longer fully independent nations." *Id.* at 246. For instance, the High Court explained that, prior to the ratification of the federal Constitution, States had the power to apply their own law to resolve interstate controversies, such as disputes over borders and water rights. *Id.* at 246. The High Court observed that "the Constitution implicitly forbids that exercise of power because the interstate . . . nature of the controversy makes it inappropriate for [S]tate law to control." *Id.* (citation and internal quotation marks omitted).

The United States Supreme Court then declared that "[i]nterstate sovereign immunity is . . . integral to the structure of the Constitution." *Id.* The High Court expressed that, "[l]ike a dispute over borders or water rights, a State's assertion of compulsory judicial process over another State involves a direct conflict between sovereigns." *Id.* at 246-47. The High Court stated that the "Constitution implicitly strips States of any power they once had to refuse each other sovereign immunity, just as it

denies them the power to resolve border disputes by political means." *Id.* at 247. The High Court's analysis reflects that, while the States retained their sovereign immunity after ratifying the Constitution, the Constitution necessarily altered the nature of that immunity to ensure the vitality of the United States' federalist system of government.

The United States Supreme Court, therefore, held that, as a matter of constitutional mandate, "States retain their sovereign immunity from private suits brought in the courts of other States." *Id.* at 236. Stated differently, as the Commonwealth Court accurately explained in *Marshall*, "[i]nstead of each [S]tate exercising its *discretion* on whether to recognize a sister [S]tate's sovereign immunity, each [S]tate was now *obligated* to recognize the other's sovereign immunity." *Marshall*, 300 A.3d at 547 (emphasis in original). Finding that *stare decisis* did not protect its contrary conclusion in *Hall*, the High Court overruled that decision.[7]

Of further importance, and as explained in more detail below, the protections that fall under the Eleventh Amendment have expanded over time and generally shield States from being sued privately pursuant to federal statutes. *Goldman*, 57 A.3d at 1170-73. As part of this evolution, the United States Supreme Court has "extended sovereign immunity to entities which are agents or instrumentalities of the [S]tate such that a suit brought against them would be, for all practical purposes, a suit against the state itself." *Id.* at 1171 (collecting cases). Although the circumstances underlying the ratification of the Eleventh Amendment were part of the historical evidence that the High Court utilized to support its holding in *Hyatt III*, that holding is not purely a product of Eleventh Amendment jurisprudence. Rather, the High Court's holding stems from a broader understanding of the manner in which the federal Constitution operates. *See, e.g., Hyatt III*, 542 U.S.

---

[7] As NJ Transit points out in its brief to this Court, "[n]umerous [S]tate courts have . . . dismissed suits based on *Hyatt III*, including claims against NJ Transit." (NJ Transit's Brief at 14-15 (citing, among other cases, Commonwealth Court's decision in *Marshall*).)

at 233 ("This case . . . requires us to decide whether the Constitution permits a State to be sued by a private party without its consent in the courts of a different State."); *id.* at 236 ("*Hall* is contrary to our constitutional design and the understanding of sovereign immunity shared by the States that ratified the Constitution."); *id.* at 237 ("*Hall*'s determination that the Constitution does not contemplate sovereign immunity for each State in a sister State's courts misreads the historical record and misapprehends the implicit ordering of relationships within the federal system necessary to make the Constitution a workable governing charter and to give each provision within that document the full effect intended by the Framers.") (citation and internal quotation marks omitted); *id.* at 246 ("Interstate sovereign immunity is . . . integral to the structure of the Constitution."). With that said, however, we discern no principled reason why the High Court would not extend its holding in *Hyatt III* to instrumentalities of the States.[8]

Applying this law to the present circumstances, the State of New Jersey indisputably enjoys interstate sovereign immunity from private suits filed in the courts of this Commonwealth. The question, therefore, becomes whether NJ Transit is an arm or instrumentality of the State of New Jersey entitled to the protections afforded by the doctrine of sovereign immunity under the circumstances contemplated in *Hyatt III*. The United States Supreme Court has yet to articulate how a State-created entity qualifies as

---

[8] Interestingly, the plaintiff in *Hyatt III*, a Nevada citizen, brought suit under Nevada law in a Nevada State court against the Franchise Tax Board of California (Board), not against the State of California. *See Hyatt III*, 587 U.S. at 234 (characterizing Board as "the state agency responsible for assessing personal income tax"); *see also* William Baude and Stephen Sachs, *The Misunderstood Eleventh Amendment*, 169 U. Pa. L. Rev. 609, 621 (2021) (*The Misunderstood Eleventh Amendment*) ("The Nevada plaintiff had filed suit in Nevada court, under Nevada law, against what the parties took to be an arm of the state of California.") (footnote omitted). The United States Supreme Court did not discuss this aspect of the case before it in *Hyatt III*.

an arm or instrumentality of a State such that interstate sovereign immunity attaches to that entity.[9]

As observed above, the Superior Court turned to this Court's decision in *Goldman* in concluding that NJ Transit is not an arm of the State of New Jersey. In *Goldman*, several plaintiffs brought a civil suit against the Southeastern Pennsylvania Transportation Authority (SEPTA), a Pennsylvania-created entity, in a Pennsylvania court, contending that SEPTA violated a federal statute, namely, the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51-60. SEPTA invoked sovereign immunity under the Eleventh Amendment, insisting that it was an arm of the Commonwealth. In response, this Court explained that the United States Supreme Court has repeatedly expanded the immunity captured in the Eleventh Amendment by finding that the States are shielded "from certain . . . types of private suits brought under federal law beyond those explicitly referenced in its text." *Goldman*, 57 A.3d at 1170.

This Court in *Goldman* further observed that the High Court has "embraced an interpretation of the Eleventh Amendment which extended sovereign immunity to entities which are agents or instrumentalities of the [S]tate such that a suit brought against them would be, for all practical purposes, a suit against the [S]tate itself." *Id.* at 1171. To determine whether SEPTA qualified as an arm of the Commonwealth, this Court utilized a six-factor test, which involves consideration of the following:

---

[9] In *Flamer*, the Superior Court stated that NJ Transit "is a public entity of the [S]tate of New Jersey and an alter ego of that [S]tate." *Flamer*, 607 A.2d at 262. The court, however, did not enunciate a test for determining whether a State-created entity qualifies as an "alter ego" of the State. Rather, the court merely cited two federal district court decisions, both of which utilized Eleventh Amendment jurisprudence, to conclude that NJ Transit is the "alter ego" of the State of New Jersey. *Smith v. New Jersey Transit Corp.*, 691 F.Supp. 888 (E.D. Pa. 1988); *Dunn v. New Jersey Transit Corp.*, 681 F.Supp. 246 (D. N.J. 1987). In short, the Superior Court's decision in *Flamer* does not aid our analysis in this case.

(1) the legal classification and description of [the entity] within the governmental structure of [the State], both statutorily and under [its] caselaw; (2) the degree of control [the State] exercises over [the entity], both through the power of appointment, and the power to subsequently veto its actions; (3) the power of the [entity's board] to independently raise revenue on its own; (4) the degree of funding provided by [the State to the entity relative to other funding sources]; (5) whether any monetary obligation incurred by [the entity] is binding upon [the State]; and (6) whether the core function of [the entity] . . . can be categorized as a function which is normally performed by local government or [S]tate government.

*Goldman*, 57 A.3d at 1179. For purposes of the Eleventh Amendment, these factors carry equal weight. *Id.*

Concluding that this test failed to resolve whether sovereign immunity protected SEPTA from being sued under FELA in a Pennsylvania court, the *Goldman* Court expressed that it was required "to consider whether allowing SEPTA to be sued under FELA in Pennsylvania courts would thwart the two principal purposes of the Eleventh Amendment . . . [*,i.e.*,] the protection of [a State's] dignity as a sovereign . . . and the protection of [a State's] treasury against involuntary depletion from suits brought by private persons." *Id.* at 1181. This Court ultimately concluded that SEPTA is not an arm of the Commonwealth of Pennsylvania for purposes of the Eleventh Amendment because allowing SEPTA to be sued pursuant to FELA does not threaten Pennsylvania's sovereign dignity nor its treasury. For these reasons, the Court held that SEPTA is "not entitled to claim immunity under the Eleventh Amendment." *Id.* at 1185.

State sovereign immunity is a complex doctrine that is not easily cabined into a singular concept. Many courts have suggested that the States enjoy two forms of sovereign immunity: the immunity expressed in Eleventh Amendment jurisprudence and a broader immunity that originated in the common law but transformed as applied to the States after the ratification of the Constitution, as explained by the High Court in *Hyatt III*. *See, e.g., Tercero v. Texas Southmost Coll. Dist.*, 989 F.3d 291, 296 (5th Cir. 2021) ("The U.S. Constitution affords two types of immunities to [S]tates. The one the district court

invoked—'Eleventh Amendment immunity'—applies to suits between a state and a citizen of another state. *See* U.S. CONST. amend. XI. The other is state sovereign immunity, which generally prohibits private suits against [S]tates (including the plaintiff's home [S]tate).") (citing *Hyatt III*); *Beaulieu v. Vermont*, 807 F.3d 478, 483 (2d Cir. 2015) ("Accordingly, there are two types of 'sovereign immunity' at issue here: (1) a particular species of sovereign immunity—Eleventh Amendment immunity from suit in federal court—and (2) the [S]tates' broader general sovereign immunity against all suits."); and *Lombardo v. Pennsylvania, Dep't of Pub. Welfare*, 540 F.3d 190, 194 (3d Cir. 2008) ("We can discern two distinct types of state sovereign immunity: immunity from suit in federal court and immunity from liability."). While these "forms" of sovereign immunity overlap, they serve differing primary objectives.

The law that has developed around the Eleventh Amendment generally holds that, under certain circumstances, States are shielded from being sued privately pursuant to federal statutes. *Goldman*, 57 A.3d at 1170-73. The primary purposes of this principle are: (1) to uphold the dignity of the States, *i.e.*, to guard against the States having to defend themselves against private lawsuits; and (2) to protect the treasuries of the States. *Id.* at 1175, 1181. While the dignity and treasuries of the States also are shielded by the so-called "broader" or common-law sovereign immunity, the more general objective of common-law sovereign immunity harkens back to its origin—divesting courts of jurisdiction over the king—by preventing the States from being exposed to process in any court without their consent. *See Hyatt III*, 587 U.S. at 238 ("The Founders believed that . . . 'common law sovereign immunity' . . . prevented States from being amenable to process in any court without their consent."). Applied in the context of interstate relations, this sovereign immunity eliminates the possibility of a State provoking a direct conflict with a sister State by preventing the latter State from compelling the sister State into its courts.

*See id.* at 246-47 ("Interstate sovereign immunity is similarly integral to the structure of the Constitution. Like a dispute over borders or water rights, a State's assertion of compulsory judicial process over another State involves a direct conflict between sovereigns."). In other words, interstate sovereign immunity ensures that each State honors the coequal sovereign status of her sister States.

*Goldman*'s six-factor test lends insight into whether a state-created entity is designed to act as either: (1) an arm of the State that enjoys the immunity associated with the Eleventh Amendment; or (2) something separate from the State, such as a corporation, that is not shielded by such immunity. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) ("The issue here thus turns on whether the Mt. Healthy Board of Education is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend."). The same general inquiry is present in this case, albeit within the framework of interstate sovereign immunity: Is a state-created entity an arm of the State or distinct from the State? Consequently, the *Goldman* test can operate as a general guidepost in determining whether a state-created entity is entitled to the benefits of interstate sovereign immunity.

The six-factors of this test, however, must be weighed differently in the context of interstate sovereign immunity given the varying primary objectives underlying interstate sovereign immunity, which is the focus of this case, as compared to the immunity associated with the Eleventh Amendment. More specifically, as noted, *Hyatt III* requires a State to avoid a direct conflict with a sister State by refusing to compel the sister State to defend against a private action in the former State's courts. Accordingly, when a Pennsylvania court is asked to determine whether a sister State created an entity that is

shielded by interstate sovereign immunity, the court must give primacy to the manner in which the sister State classifies and describes the entity within the structure of that State. In other words, the first *Goldman* factor plays a key role in determining whether an entity created by a sister State operates as that State's instrumentality, as that factor provides the clearest expression of the sister State's intention in designing the entity in question.

Applying the *Goldman* factors to the present circumstances, the first, second, and sixth factors weigh heavily in favor of concluding that NJ Transit is an arm of the State of New Jersey. The New Jersey Public Transportation Act of 1979 (Transportation Act or Act), N.J. Stat. Ann. §§ 27:25-1 to -24.2, established NJ Transit. In the Act, the New Jersey Legislature made several findings and declarations, including that the "provision of efficient, coordinated, safe and responsive public transportation is an essential public purpose." N.J. Stat. Ann. § 27:25-2(a). The New Jersey Legislature further declared that, "[a]s a matter of public policy, it is the responsibility of the State to establish and provide for the operation and improvement of a coherent public transportation system in the most efficient and effective manner." *Id.* § 27:25-2(b). The Transportation Act provides NJ Transit with "the necessary powers to accomplish the[se] purposes and goals." *Id.* § 27:25-2(e). As noted above, the New Jersey Legislature specifically characterized NJ Transit "as an instrumentality of the State exercising public and essential governmental functions" and announced that "the exercise by the corporation of the powers conferred by this act shall be deemed and held to be an essential governmental function of the State." *Id.* § 27:25-4(a).

The Transportation Act also makes clear that the political branches of the State of New Jersey exercise a significant degree of control over NJ Transit. NJ Transit is "established in the Executive Branch of the State Government" and is "allocated within the Department of Transportation[,]" though NJ Transit operates independently from the

Department of Transportation. *Id.* § 27:25-4(a). NJ Transit is governed by a thirteen-member board, which consists of the Commissioner of Transportation, the State Treasurer, another member of New Jersey's Executive Branch chosen by the Governor, six public members appointed by the Governor upon the advice and consent of the New Jersey Senate, one public member appointed by the Governor upon the recommendation of the President of the Senate, one public member appointed by the Governor upon the recommendation of the Speaker of the General Assembly, and two non-voting members, one of which is appointed by the Governor "upon the recommendation of the labor organization representing the plurality of the employees of the corporation involved in rail operations" and one that is appointed by the Governor "upon the recommendation of the labor organization representing the plurality of the employees of the corporation involved in motorbus operations." *Id.* § 27:25-4(b). The Commissioner of Transportation serves as the chairperson of NJ Transit's board, *id.* § 27:25-4(d), and annually reviews NJ Transit's finances, *id.* § 27:25-20(a).

Of further note, the Transportation Act requires the NJ Transit board to deliver the minutes of every meeting to the Governor and provides that "[n]o action taken at such meeting by the board shall have force or effect until approved by the Governor or until [ten] days after such copy of the minutes shall have been delivered." *Id.* § 27:25-4(f). Moreover, the New Jersey Legislature has the authority to override NJ Transit's decisions to acquire certain privately-owned properties by means of eminent domain. *Id.* § 27:25-13(g). NJ transit also is required to provide a detailed annual report regarding its activities for the preceding fiscal year to, among others, the Governor, the President of the Senate, and the Speaker of the General Assembly. *Id.* § 27:25-20(b).

As detailed above, the Transportation Act evinces New Jersey's intent to have NJ Transit perform the core, governmental function of providing public transportation to

New Jersey's citizens. The Act also provides NJ Transit with powers unique to States. For example, the Act permits NJ Transit to acquire land and property by means of eminent domain. *Id.* § 27:25-13; *see Mississippi & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 406 (1878) ("The right of eminent domain, that is, the right to take private property for public uses, appertains to every independent government. It requires no constitutional recognition; it is an attribute of sovereignty."). "NJ Transit is also considered [S]tate property for tax purposes and is exempt from [S]tate taxation." *Karns*, 879 F.3d at 517 (citing N.J. Stat. Ann. § 27:25-16). In *Karns*, the Third Circuit explained that these attributes are associated with sovereignty. *Id.* (citing *Christy v. Pa. Tpk. Comm'n*, 54 F.3d 1140, 1148 (3d Cir. 1995); and *Skehan v. State Sys. of Higher Educ.*, 815 F.2d 244, 249 (3d Cir. 1987)). The Act further establishes a NJ Transit Police Department. N.J. Stat. Ann. § 27:25-15.1. The Police Department's "officers are vested with 'general authority, without limitation, to exercise police powers and duties . . . in all criminal and traffic matters at all times throughout the State.'" *Karns*, 879 F.3d at 517 (quoting N.J. Stat. Ann. § 27:25-15.1(a)).

As to the third, fourth, and fifth *Goldman* factors, the Transportation Act empowers NJ Transit to independently raise revenue in a number of ways. For example, NJ Transit is permitted to: (1) apply for and accept gifts and grants from, among others, private sources, N.J. Stat. Ann. § 27:25-5(g); (2) lease or sell real and personal property, *id.* § 27:25-5(k); and (3) collect fares, *id.* § 27:25-5(n). NJ Transit's operating budget is funded through a number of streams, including passenger fares "and a combination of commercial revenue and state and federal resources."[10] The Transportation Act further suggests that the State of New Jersey would not be liable for a judgment entered against NJ Transit. *See id.* § 27:25-17 (stating that "[n]o debt or liability of the corporation shall

---

[10] *See* https://www.njtransit.com/press-releases/nj-transit-adopts-fiscal-year-2024-operating-and-local-programs-budget-secures (last visited Jan. 23, 2024).

be deemed or construed to create or constitute a debt, liability, or a loan or pledge of the credit of the State").

While these three factors to some extent indicate that NJ Transit is a separate entity from the State of New Jersey, the first, second, and sixth factors strongly support a conclusion that New Jersey created NJ Transit to act as its arm to provide and operate a public transportation system, which the New Jersey legislature has deemed to be an essential governmental function. Indeed, the Transportation Act provides a good reason to believe that the State of New Jersey designed NJ Transit to enjoy the protections of interstate sovereign immunity. *See Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47 (1994) (stating that, when faced with question regarding applicability of immunity associated with Eleventh Amendment, High Court must consider "whether there is here 'good reason to believe' the States and Congress designed [a port authority] to enjoy Eleventh Amendment immunity") (quoting *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency,* 440 U.S. 391, 401 (1979)). As a coequal sovereign to New Jersey, Pennsylvania must honor this decision and refuse to allow NJ Transit to be haled into Pennsylvania courts to defend against private suits.

We recognize that the highest court of the State of New York, the Court of Appeals of New York, recently reached a contrary result in *Colt v. New Jersey Transit Corporation*, 2024 WL 4874365 (N.Y. 2024) In so doing, the New York High Court determined that, "[i]n considering whether a foreign [S]tate-created entity is entitled to sovereign immunity in New York, courts should consider: (1) how the State defines the entity and its functions, (2) the State's power to direct the entity's conduct, and (3) the effect on the State of a judgment against the entity." *Id.* at *5. The Court concluded that: (1) the first factor "leans toward according [NJ Transit] sovereign immunity," *id.* at *6; and (2) the second factor "does not weigh heavily in either direction." *Id.*

As to the last factor, the New York High Court reported that, under N.J. Stat. Ann. § 27:25-17, New Jersey "clearly disclaimed any legal liability for judgments against [NJ Transit], counseling against treating [NJ Transit] as an arm of New Jersey." *Id.* at *7. The Court then opined as follows:

> Balancing each consideration, we conclude that New Jersey's lack of legal liability or ultimate financial responsibility for a judgment in this case outweighs the relatively weak support provided by the other factors. Put simply, allowing this suit to proceed would not be an affront to New Jersey's dignity because a judgment would not be imposed against the State, and the entity that would bear legal liability has a significant degree of autonomy from the State. We therefore conclude that [NJ Transit] is not an arm of New Jersey and may not invoke sovereign immunity.

*Id.* (footnotes omitted).

Our disagreements with the New York High Court are obvious. In our view, the Transportation Act, which defines NJ Transit and its functions, strongly evidences that New Jersey views NJ Transit as its arm for purposes of providing public transportation. The Act also demonstrates that the political branches of the State of New Jersey have significant power over NJ Transit, as the New Jersey Executive and Legislative branches appoint NJ Transit's board and the board can take no action without seeking the Governor's approval following a meeting. While it seems that the New York High Court is correct that the State of New Jersey would not be responsible for a judgment entered against NJ Transit, we do not place significant weight on this factor under the circumstances presently before us. Rather, as we explained above, we view the first factor as the driving force in concluding that NJ Transit is an arm of the State of New Jersey.

NJ Transit's arguments to this Court align with our analysis. Galette, however, attempts to avoid the result of our interpretation and application of the controlling law by contending, in a confusing fashion, that the issues that we granted allowance of appeal

to consider are moot "because the negligent actions of [NJ Transit's] employee, bus driver, under New Jersey law are ministerial actions that are not afforded immunity under the New Jersey Tort Claims Act," N.J. Stat. Ann. §§ 59:1-1 to :12-3.  (Galette's Brief at 4.)  This argument misses the mark.

As best we can discern, Galette is arguing that the State of New Jersey waived sovereign immunity for purposes of the circumstances of this case in the New Jersey Tort Claims Act.  In the context of discussing the immunity associated with the Eleventh Amendment, the United States Supreme Court has stated that "[c]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights, and we see no place for it here." *Edelman v. Jordan*, 415 U.S. 651, 673 (1974).  In *Edelman*, the High Court explained that, "[i]n deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction.'" *Id.* (quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171 (1909)).  Further expounding upon this concept, the High Court has expressed that "a State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation.  Nor does it consent to suit in federal court merely by stating its intention to 'sue and be sued.'" *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999) (internal citations omitted).

Like the immunity associated with the Eleventh Amendment, interstate sovereign immunity is grounded in the federal Constitution.  A State's waiver of that immunity, therefore, must be express.  Galette has failed to identify any provision of New Jersey law generally or the New Jersey Tort Claims Act specifically that evinces New Jersey's express consent to be sued in Pennsylvania courts pursuant to Pennsylvania law.  Moreover, although the Transportation Act permits NJ Transit to sue and to be sued, N.J.

Stat. Ann. § 27:25-5(a), the United States Supreme Court has concluded that such a statement is insufficient to act as a waiver of constitutionally grounded immunity. For these reasons, Galette's argument is meritless.

## IV. Conclusion

In *Hyatt III*, the United States Supreme Court unequivocally held that "States retain their sovereign immunity from private suits brought in the courts of other States." *Hyatt III*, 587 U.S. at 236. Here, Galette filed a private suit under Pennsylvania law in a Pennsylvania court against NJ Transit, an entity that New Jersey created as an instrumentality of that State. Consistent with *Hyatt III*, we conclude that interstate sovereign immunity precludes Galette's suit as it pertains to NJ Transit. Because the Superior Court erred in holding otherwise, we reverse the Superior Court's judgment, which results in the reversal of the trial court's order denying NJ Transit's motion to dismiss. Consequently, NJ Transit is dismissed from this litigation. We, however, remand the matter to the trial court for further proceedings relative to Galette's allegations of negligence against McCrey.

Chief Justice Todd and Justices Donohue, Dougherty, Wecht, Mundy, and McCaffery join the opinion.